Filed 3/10/17 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE EX REL. JEFF W. REISIG, AS DISTRICT ATTORNEY, | C068868 |
| Plaintiff and Respondent, | (Super. Ct. No. CVCV04002085) |
| v. | ORDER MODIFYING OPINION |
| TIMOTHY ACUNA et al., | [NO CHANGE IN JUDGMENT] |
| Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed herein on February 28, 2017, be modified as follows:

1

On page 4, near the end of the paragraph that started on page 3 with "Appellants argue evidentiary error" delete the sentence "For its part, the Attorney General offers this court no help, instead compounding the problem with a 458-page rambling respondent's brief plus 28-page addendum."


BY THE COURT:


       RAYE       , P. J.


       HULL       , J.


       BUTZ       , J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE EX REL. JEFF W. REISIG, AS DISTRICT ATTORNEY, etc.,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>TIMOTHY ACUNA et al.,<br><br>      Defendants and Appellants. | C068868<br><br>(Super. Ct. No. CVCV04002085) |

APPEAL from a judgment of the Superior Court of Yolo County, Kathleen M. White, Judge.  Affirmed.

Law Office of Mark E. Merin and Mark E. Merin, Cathleen A. Williams and Paul H. Masuhara for Defendants and Appellants.

Kamala D. Harris, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Eric L. Christoffersen, Deputy Attorney General, Robert C. Nash , Deputy Attorney General, for Plaintiff and Respondent.

Eight individuals appeal from a civil judgment granting a permanent (seven-year) injunction enjoining public nuisance activities of a criminal street gang.

Yolo County District Attorney Jeff W. Reisig on behalf of the People of the State of California (plaintiff), filed this civil action against the Broderick Boys criminal street gang (a/k/a BRK a/k/a BSK a/k/a Norteno a/k/a Norte a/k/a XIV) and 23 of its members, to enjoin as a public nuisance (Civ. Code, §§ 3479-3480) activities in a 2.98-square-mile area (safety zone) of West Sacramento. The safety zone is bounded by Harbor Boulevard to the west, the Sacramento River to the north and east (but not including the area previously known as the Lighthouse Marina and Golf Course), and by Highway 50/Business Loop 80/State Route 275 to the south.

In a prior appeal, we affirmed, for the most part, a *preliminary* injunction. (*People ex rel. Reisig v. [Timothy] Acuna* (2010) 182 Cal.App.4th 866 (*Acuna I*).)

This appeal by eight individual defendants (appellants) comes after a bench trial during which the eight appellants were represented by various attorneys. The trial served as a prove-up hearing as to defaulting defendant Broderick Boys. The trial court issued a judgment and permanent (seven-year) injunction against defendant Broderick Boys, its a/k/a's, and its "active members" including but not limited to 17 individual defendants -- Timothy Acuna, Victor Dazo, Jr., Alex Estrada, Ramon Esquilin, Jesse Garcia, Michael Hernandez, Rainey Martinez, William McFadden, Robert Montoya, Michael Morales, Guillermo Duke Rosales, Robert Sanchez, Paul Savala, Abel Trevino, Felipe Valadez, Jr., Billy Wolfington, and Tyson Ybarra. Several of the original defendants were dismissed.[1]

---

[1] The trial court dismissed Thomas Cedillo, Robert Cortez, Victor Ferreira, Rudy Tafoya, and William Ybarra, Jr. But the trial court found Ferreira, Tafoya, and Ybarra were active Broderick Boys members at relevant times. The court severed the case as against defendant Rudy Ornelas, finding him unavailable because of his pending criminal case and withdrawal of his attorney in this civil case. The judge considered Ornelas's activity on the question of Broderick Boys' pattern of criminal activity. The trial court found Ornelas was a Broderick Boys member, noted he was convicted of offenses including attempted murder in trial court case No. CRF 07-005385, and ordered plaintiff to proceed against Ornelas or dismiss him; it is not clear what choice plaintiff made.

The trial court found Broderick Boys is a criminal street gang which, through its members, creates a public nuisance in the safety zone by engaging in violent assaults, robberies, trespass, theft, illegal possession of weapons, possession of drugs for sale, "tagging" public and private property with gang symbols, displaying gang symbols and signals to intimidate residents, and threatening and retaliating against persons perceived to have disrespected the gang. The injunction enjoins the gang and its active members from engaging in nuisance activities and also restrains them from other activities including (1) associating with known members (standing, sitting, walking, driving, gathering, or appearing in public) except inside or traveling to or from school or church, and (2) being out in public between 10:00 p.m. and 6:00 a.m., subject to exceptions.

This appeal from the permanent injunction is limited to the eight defendants/appellants -- Timothy Acuna, Alex Estrada, Jesse Garcia, Robert Montoya, Michael Morales, Guillermo Duke Rosales, Felipe Valadez, Jr., and Billy Wolfington. We have no need in this appeal to address enforceability of the injunction as to anyone else.

Appellants argue evidentiary error, insufficiency of evidence, constitutional claims, and miscellany. They fail to show prejudicial evidentiary error, yet appear to assume in their substantial evidence argument that we should disregard the evidence they challenged. Appellants misstate facts and law (despite taking almost a year to prepare the opening brief) and fail to support each factual assertion in their brief with a citation to the record, as required by California Rules of Court, rule 8.204(a)(1)(C). Appellants' reply brief acknowledges the opening brief's factual misstatements and defects but dismisses them as inconsequential and nonprejudicial to plaintiff. Appellants thus miss the point that they have the duty on appeal to state the evidence fairly, in the light most favorable to the trial court's ruling, and record citations are for the benefit of the reviewing court as well as the respondent. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*); *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 112-114

3

(*Lewis*).)  Appellants' neglect is particularly burdensome, given that they submitted **380** pages of initial briefing (114-page opening brief plus 266 pages of addenda of purported facts and objections).  For its part, the Attorney General offers this court no help, instead compounding the problem with a 458-page rambling respondent's brief plus 28-page addendum.  Appellants' 71-page reply brief rounds out the mass.  Despite appellants' defects, we nevertheless endeavor to address their contentions.

Appellants appear to advocate a standard whereby an individual cannot be subject to a gang injunction unless he personally commits multiple nuisance activities.  We explain the correct standard is that an individual can be subject to the injunction if he is an active member of a gang whose members commit nuisance activities, and active membership does not mean personal commission of multiple nuisance activities.

Additionally, much of appellants' briefing hinges on the flawed premise, unsupported by authority, that the relative success of the *preliminary* injunction in reducing nuisance activity must inure to appellants' benefit, commanding a conclusion that there is no longer an ongoing need for injunctive relief.  However, a permanent injunction is appropriate where the misconduct is ongoing or likely to recur and, while a permanent injunction may be inappropriate where the defendant discontinued the misconduct *voluntarily and in good faith*, compliance with a court order (here, the preliminary injunction) does *not* constitute voluntary discontinuation.  (*Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1658-1659 (*Feminist*).)

While this appeal was pending, the California Supreme Court held a gang expert cannot base an opinion on the assumed truth of case-specific facts that are inadmissible hearsay for which no independent competent evidence is adduced.  (*People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13 (*Sanchez*), disapproving *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*).)  This aspect of *Sanchez* concerning state evidentiary rules for expert testimony (Evid. Code, §§ 801-802) applies in civil cases such as this nuisance lawsuit.  We allowed supplemental briefing, as we discuss *post*.  To avoid potential

4

complications that might otherwise arise in light of *Sanchez*, we focus in this appeal on evidence that did *not* depend on experts' assuming the truth of case-specific hearsay not proven by independent competent evidence or subject to a hearsay exception --, e.g., records of criminal convictions, trial testimony or spontaneous statements by victims, and non-case-specific hearsay about gang culture. We reject *post* appellants' suggestion that evidence improperly admitted may have been the deciding factor in the trial court's decision.

We affirm the judgment.

PRIOR PROCEEDINGS AND APPEALS

Plaintiff filed the original complaint in December 2004, naming only Broderick Boys (with a/k/a's) as defendant. The trial court issued a *default* injunction in February 2005. (*People ex rel. Reisig v. Broderick Boys* (2007) 149 Cal.App.4th 1506, 1514 (*Broderick Boys*).) On April 23, 2007, we reversed the default injunction, holding that (1) four individuals served with the injunction had standing to challenge it; (2) Broderick Boys was not an "unincorporated association" *for purposes of service of process* (Code Civ. Proc., § 416.40, subd. (b); Corp. Code, § 18220), because the gang had no "lawful purpose" (Corp. Code, § 18035); and (3) even if the gang were an unincorporated association, service of the complaint on only one member of unknown rank was insufficient. (*Broderick Boys*, at p. 1511.)

Plaintiff filed the operative amended complaint in July 2007, seeking an injunction against Broderick Boys (with a/k/a's) and 23 individuals. The court entered default judgments in 2007 against nine individuals (none of whom are appellants in this appeal) -- Victor Dazo, Jr., Ramon Esquilin, Michael Hernandez, Rainey Martinez, William McFadden, Robert Sanchez, Paul Savala, Abel Trevino, and Tyson Ybarra. The judgment at issue in this appeal finds these nine are still Broderick Boys active members responsible for the public nuisance.

After submission of declarations and a hearing, the trial court granted a *preliminary* injunction in May 2008. The court entered default against defendant Broderick Boys in October 2009. In an appeal from the *preliminary* injunction (*Acuna I, supra,* 182 Cal.App.4th 866), we upheld the preliminary injunction, except for (1) an overbroad restriction on controlled substances that would have prohibited gang members from entering pharmacies, and (2) a vague restriction on alcohol that would have barred members from being in the presence of someone drinking alcohol in a restaurant. (*Id.* at pp. 888, 892.) We held substantial evidence supported the trial court's conclusion that plaintiff was likely to prevail in showing Broderick Boys is a criminal street gang and engages in public nuisance activities. (*Id.* at p. 879.) We said defendants forfeited their challenge to the findings of their active membership, because they made no individualized arguments and did not explain how the evidence was insufficient. (*Ibid*.)

FACTS AND PROCEEDINGS OF CURRENT APPEAL

At the bench trial in 2010, plaintiff presented two criminal street gang experts -- Police Detective Joe Villanueva and Sergeant Jason Winger -- both of whom also had personal experience investigating gang-related crimes.

Villanueva worked for the West Sacramento Police Department (WSPD) and Yolo County's District Attorney between 2000 and 2007. He then transferred to Fairfield but keeps up with Broderick Boys' "goings-on" through continued communications with WSPD. Villanueva has a master's degree in criminal justice and did his master's thesis on gang injunctions. Winger testified to his 16 years of experience on the WSPD and was still working there at the time of trial. Since 2007, he has patrolled the field as part of the Community Response Team (CRT), which he now supervises.

Nortenos is a criminal street gang with primary activities of murder, assault, robbery, drug sales, and vehicle theft. Nortenos' rival is the Sureno gang. Nortenos use signs or symbols, such as wearing red and displaying "Norte," "N," "14," or "XIV."

6

Norteno gang members typically tattoo themselves with these symbols. The Norteno gang has subsets -- factions that come from designated areas separated by city or turf within a city -- who share the Norteno philosophy and use Norteno signs and symbols.

Broderick Boys is a criminal street gang and subset of the Nortenos. Broderick Boys' primary territory is the northern part of West Sacramento, including the Broderick neighborhood on the eastern side. Broderick Boys' primary activities are assaults, firearms offenses, drug sales, vehicle theft, and gang graffiti. They engage in violent assaults against rival Surenos and intimidate citizens to discourage cooperation with police and facilitate gang operations, including illicit drug trade. Victims have moved away.

In addition to using Norteno symbols, Broderick Boys uses "BRK," "BSK" (Broderick Scrap [Sureno] Killer), and adopts corporate logos as its own, e.g., a Boston Red Sox hat (a red hat with a B). Broderick Boys does not have a formal organization structure but has an informal structure, where senior members (original gangsters or OGs) have more influence than newer members and determine the course of the informal policy.

People typically join Broderick Boys through family connections with existing members or by being "jumped in" (submitting to beatings), and females can join by being "sexed in" (having sex with members). Members establish themselves by "putting in work" for the gang (committing violence or selling drugs) to earn respect. They show commitment to the gang by "patrolling" -- going out in groups looking for a fight or confrontation to show willingness to assault others and instill fear in the community.

Villanueva opined specific individuals were active Broderick Boys gang members at relevant times, including the eight appellants, the other named defendants who did not appeal, and numerous other individuals ultimately found by the trial court to be active members. We discuss specific evidence regarding the eight appellants *post* in our

7

discussion of their substantial evidence challenge to the trial court's finding of their active membership.

Villanueva based his opinions on his personal interactions with the individuals, their self-admissions, their gang tattoos, and his review of documents such as field interview cards, police reports, and jail classifications. Jail intake questionnaires ask new arrivals to check a box yes or no as to whether they are gang-affiliated, and to sign the intake form. Winger also opined specific individuals were active Broderick Boys gang members, based on Winger's personal contacts with them, involvement in criminal investigations, review of police records, and gang tattoos. Winger said that, in overall gang lifestyle, it is highly likely that if someone were to get a gang tattoo without being a gang member, that person would be "acted upon by actual members."

While the preliminary injunction was in place, Villanueva noticed a reduction in Broderick Boys crimes, self-admissions, and public association. Before the injunction, he regularly saw gang members hanging out in groups on street corners, but less so after the injunction. Broderick Boys members, including (defendant) Billy Wolfington, told Villanueva that the injunction was driving them "underground." Winger testified the practice of "flashing" gang tattoos (displaying them in a manner trying to attract attention) has diminished in the last five years, since the first iteration of the gang injunction. "Historically," Broderick Boys members hang out in public together, but not so much since the injunction.

Plaintiff adduced evidence of multiple public nuisance activities, through testimony of victims, witnesses, law enforcement officers, and judicial notice of criminal court records. These activities dated back to around 2001, diminished while injunctions were in effect (February 2005 to April 2007, and May 2008 to the present), yet occurred even in 2010 shortly before trial. The trial court acknowledged its duty to determine whether there was an ongoing need for injunctive relief but allowed older incidents to counter defendants' denial of the existence of a Broderick Boys criminal street gang.

8

A lot of evidence was adduced over defense objection, subject to plaintiff "connecting the dots" to show the individuals were active Broderick Boys members. We disregard evidence concerning individuals who did not make it onto the court's list of active members in the statement of decision. We also disregard evidence involving just one person, e.g., being found in possession of drugs, etc. After the bench trial, the California Supreme Court in a criminal case, *People v. Rodriguez* (2012) 55 Cal.4th 1125, held a defendant's commission of attempted robbery while acting alone did not fall within the elements of the gang participation offense under Penal Code section 186.22, subdivision (a), which requires willful promoting, furthering, or assisting in felonious criminal conduct by gang "members" (plural), though a gang enhancement (*id*. § 186.22, subd. (b)) might apply to such a person. (*Rodriguez, supra*, 55 Cal.4th at pp. 1130-1132.) While different concerns govern this civil injunction case, we focus on evidence of incidents involving more than one person and/or incidents resulting in final convictions of gang offenses or enhancements.

We set forth a sampling of recent activities within a few years of the 2010 trial, all involving persons found by the trial court to be active Broderick Boys members.

On February 17, 2007, police stopped (defendant) Timothy Acuna driving a stolen car, with (defendant) Alex Estrada as passenger. Acuna was convicted of vehicle theft with a gang enhancement in case No. 07-0982.

Cesar Lara-Morales was convicted of a March 2, 2007, assault with a firearm and a gang enhancement as well as battery and gang activity in case No. 07-1438.

Daniel Bonge, Austin Nunez, and Pauliton Nunez were convicted of assault with gang enhancements in case No. 07-2135, for their April 16, 2007, attack on an Amtrak train engineer. The engineer testified he stopped the train because a person was on the tracks. The engineer got off the train, saw a group of people, and told them to leave. They instead kicked the engineer and struck him with rocks, a fire extinguisher, and a vodka bottle, leaving him with a concussion, broken finger, bruised ribs, sprained ankle

9

and shoulder, and a head wound requiring 13 staples to close. They tried to take his wallet and cell phone. Appellants claim the record is unclear whether this incident occurred within the safety zone, but they fail to cite to the transcript where the location was described as "the eastern perimeter of the Safety Zone, right at the edge of the western bank of the Sacramento River and I Street" near the I Street Bridge. Plaintiff also submitted photos of Bonge and both Nunezes making the letters "B" and "N" with their fingers, and folding their arms to form "XIV." The Amtrak incident occurred after oral argument in *Broderick Boys, supra*, 149 Cal.App.4th 1506, and a week before we filed the April 23, 2007, opinion overturning the default injunction. (See *id* at pp. 1517, 1521 [referencing oral argument].)

On August 15, 2007, police photographed graffiti on houses under construction -- e.g., "BRK" in red paint, a red B painted on a door, X4 painted on a wall, "FUCK X3 [Surenos]," and "Don't fuck with BRK."

On September 28, 2007, police assisting a parole check found (defendant) Michael Hernandez in possession of marijuana and methamphetamine. He pleaded no contest to a drug offense and admitted a gang enhancement in case No. 07-5524.

In October 2007, police found drugs in a car driven by Daniel Orozco accompanied by Thomas Mendes and, in a separate incident found stolen property in a car driven by Orozco.

On November 9, 2007, police encountered in the street two wounded and agitated juveniles who reported they had just been attacked by Lorenzo Castanon (whom they knew) and another male, who demanded money from them. Police located Castanon in the company of Benito Morales, Jr., and Shawn Ruiz.

On December 11, 2007, police took photos of cars painted with graffiti including "BRK" and "X4."

In March 2008, gang graffiti was spray-painted on cars, public sidewalks, trees, and residences on Portsmouth Way in West Sacramento.

10

The preliminary injunction issued in May 2008.

A police officer testified that, on September 7, 2008, a victim reported that a person, later identified as Manuel Diaz, approached the victim, called him a "scrap," said, "I [Diaz] am a Norte," hit the victim several times with a wrench, kicked the victim when he fell to the ground, and stole the victim's bike. Manuel Diaz was convicted of grand theft with a gang enhancement.

Richard Dazo, Hillario Estrella, and Joshua Osborne were each convicted of a January 2009 assault with bodily injury and a gang enhancement in case No. 09-0110 for assaulting a female and stealing her backpack. A police officer asked Estrella if he "put in work" for Broderick Boys, which is a term of art in gang culture, meaning doing something to benefit the gang or further the gang, such as committing a criminal act like robbery, assault, or car theft. The officer did not define "put in work" when speaking with Estrella, but Estrella answered the question by saying he fought rival gang members.

On February 11, 2009, police conducted a parole search at the residence of Michael Fragoso and Joseph Freed and found marijuana, methamphetamine, cocaine salt, a red hat with the word "Norte," several hats with "B" or "N" on them, and red clothing. Freed had a "1" and "4" tattooed on his chest. Fragoso had a "B" with a crown tattooed on his arm and shoulder. (5RT 1388-1394)

Christopher Castillo was convicted of a March 6, 2009, gang activity offense in case No. 09-1349. He and his brother -- minor J.C. -- attacked the victim, leaving small puncture wounds on his back and lacerations on his torso. The following day, police responded promptly to a dispatch about a fight and spoke with victim J.R., who related that "Cricket" (Christopher Castillo) and two others approached the victim and his friends in the street and asked if they were "scraps" (Surenos). J.R. said no. Castillo or one of his companions said, "Well, this is Broderick, Homey," and all three struck J.R., leaving him with a swollen lip and forehead, and took his bicycle.

11

On March 18, 2009, Angel Sanchez and Jesse Sanchez assaulted a victim at his home. In this civil case, plaintiff called Angel Sanchez as a witness, but he invoked the Fifth Amendment on the witness stand. The trial court found him unavailable as a witness and admitted into evidence his testimony from his prior criminal trial for the March 2009 assault (case No. 09-1474). The defense in this case objected that Sanchez's prior testimony did not constitute declarations against interest because they were motivated by his desire to receive a lower sentence. The court ruled Angel's statements about being in a gang and getting tattoos were "part of the larger pattern that could be considered against his interests." In his testimony in the criminal case, Angel Sanchez said he was then a Broderick Boy and had gang tattoos on his face, arms, and hands, and one way to join was to be "jumped in" to the gang, though he was not jumped in but joined because he had family members involved in the gang. Angel Sanchez testified he "put in work" for the gang by fighting members of other gangs. Plaintiff's gang expert testified Angel Sanchez contributes to the nuisance but at the time of this trial was in custody awaiting sentencing on his criminal case.

On April 3, 2009, a probation search of the residence of Manuel and Carlos Guzman revealed a shotgun, ammunition, items with gang graffiti, and marijuana. In case No. 09-1660, Carlos Guzman pleaded no contest to active participation in a criminal street gang and was sentenced to 16 months in prison, and Manuel Guzman (who less than two years earlier told police he was a Broderick Boy), pleaded no contest to possession of a firearm with a prior conviction and active participation in a criminal street gang.

Shortly before trial began in July 2010, a series of incidents inside the safety zone culminated in a violent attack in March 2010 at a pre-arranged location outside the safety zone -- Memorial Park. Victim J.H. and his father Mr. H. testified about the initial events. In early January 2010, J.H.'s brother, minor R.H., got into a fight with Brandon Lanzi (identified as minor B.L. in the statement of decision), cousin of then-Broderick-

12

Boy Abel Morales. In mid-January 2010, R.H. got into a fight at school with the brother of validated Broderick Boys gang member Alexander Valadez. Mr. H., arrived at the school to pick up his sons. Alexander Valadez and his girlfriend, J.L., were standing nearby, and J.L. said to Mr. H., "what are you looking at n*****," and "we know you live [at a specified street and apartment number]." As the H. family headed home, Alexander Valadez drove past, with his brother, J.L., and Abel Morales in the car, yelling, "Broderick." They were sitting in their car outside the H. family's home when the H. family arrived. Alexander Valadez yelled, "it's on, n*****. We got clips. We got nines. I am going to call my uncle. I got my uncle, and he's bigger than you, you know." Alexander Valadez also said something about "kill" and "we all own this area; we are Broderick." Later that day, Valadez, J.L., and Abel Morales drove by again. A few days later, Valadez and a companion were sitting in a car when Mr. H. arrived home. Valdez made eye contact and then drove away.

Arrangements were made for a fight between R.H. and Abel Morales at Memorial Park -- outside the safety zone -- on March 19, 2010. On their way to the park, J.H. and R.H. were accosted by Broderick Boy Christopher Castillo, who rode up on his bike and said, "you got funk with my cousin." At the park, Castillo looked at R.H. and said, "this is Broderick." J.H. said Castillo, who was an adult, was too old to fight teen R.H. Castillo swung at J.H., and they did battle. Several cars arrived, and about 10 people got out and attacked J.H. and R.H. while using racial slurs and yelling, "this is Broderick." Abel Morales and Benny Hammond hit J.H. and, when he fell to the ground, hit and kicked him. J.H. got up, and Castillo hit him on the head with a hammer several times, causing bleeding. R.H. was kicked, stomped on, and had a knife thrown at him. The attackers drove away as police arrived. An officer testified that, of the crowd of bystanders, only two were willing to give a statement. Others said they were afraid to get involved. Victim J.H.'s father testified he had to move his family away from the home they loved, out of fear of the Broderick Boys gang.

13

The trial court took judicial notice that Charles Dalby Dykes, Benny Hammond, Brandon Lanzi, and Alexander Valadez were convicted of gang activity offenses or assault with gang enhancements in connection with the Memorial Park incident. Abel Morales was convicted of assault with great bodily injury. (Pen. Code, § 245.) On our own motion, we take judicial notice that Christopher Castillo was later convicted of conspiracy, assault with a deadly weapon by force likely to produce great bodily injury, participation in a criminal street gang, plus gang enhancements, and we affirmed the judgment in an unpublished opinion, *People v. Castillo*, C073250, filed June 11, 2015 (rev. denied).

On June 4, 2010, police contacted Jesse Contreras, a validated gang member, about his violating a probation condition that he not associate with gang members. Contreras had a fresh "BRK" tattoo on his stomach.

In early August 2010, police stopped Scott Delgado and two others, all of whom were subject to the injunction, violating the 10:00 p.m. curfew provision of the injunction.

The trial court allowed Officer Labin Wilson to testify as a gang expert in plaintiff's rebuttal case, regarding an assault that occurred in the safety zone on November 6, 2010 (during trial). As we discuss *post*, for purposes of this appeal, we will assume the trial court erred in allowing this evidence but will conclude any error was harmless.

### *The Defense Case*

The defense presented gang experts who opined neither Nortenos nor Broderick Boys are a criminal street gang. A former prison warden testified that jail intake classification does not necessarily mean the person is a member of a criminal street gang. The defense called as witnesses numerous residents of the community, including

14

defendants' friends and family, who testified they did not witness any public nuisance activity in the safety zone and did not fear for their safety.

*Statement of Decision and Judgment*

In a statement of decision and judgment filed June 16, 2011, the trial court granted an injunction to restrain appellants' activities within the safety zone.

Applying the standard of clear and convincing evidence, the trial court found Broderick Boys is a criminal street gang whose members have created a public nuisance, and appellants are active members. The court found credible the testimony of plaintiff's witnesses. The court found "less credible" defense witness denials of the existence of the Broderick Boys gang, because of some witnesses' relationships to named defendants, apparent motive to minimize defendants' actions, lack of personal knowledge regarding certain events, and use of the phrase "I don't recall" and/or gaps in their knowledge or recollection.

The court found defendants' conduct "has obstructed the free use of property in the Safety Zone, interfered with the comfortable enjoyment of life and property in the Safety Zone, and unlawfully obstructed the free passage and use, in the customary manner, of public parks and places." The conduct "has affected and continues to affect a substantial number of people who live and work in the Safety Zone." "Without the injunction, defendants, and each of them, will continue to maintain the nuisance by participating in and encouraging their criminal and nuisance activities, irreparably harming the community and the individuals who live and work in the Safety Zone." "The nuisance is ongoing, and although attenuated somewhat since the issuance of the preliminary injunction, it still exists."

The court noted WSPD evidence that a process exists for persons to be removed from the list of active members by inactivity or by "opting out."

The court found it appropriate to limit the term of the injunction to seven years, because younger members typically "age out" of the youthful criminality; older members move away or are incarcerated long-term; and it is speculative whether new members will replace old members (in light of the decline in activity while the preliminary injunction has been in effect and absence of evidence of recruitment). The injunction has been in place in various iterations since February 3, 2005, and seven more years "is sufficient for law enforcement to use the injunction to further attenuate the nuisance activity in the Safety Zone until the injunction is no longer necessary, and the residents of the Safety Zone who oppose the injunction will not suffer what they perceive to be a permanent blemish on their neighborhood." The court retained continuing jurisdiction in equity over the terms and duration of the injunction. (Civ. Code, § 3424.) Unless modified, the injunction will expire in 2018 -- seven years after entry of judgment.

The judgment enjoined and restrained Broderick Boys and its active members from:

(1) appearing in public with any known member of Broderick Boys, except when in school on school business or church (the non-association order);

(2) intimidating any person known to be a witness or victim or complainant concerning Broderick Boys activity (the no-intimidation order);

(3) possessing or knowingly being in the presence of any gun, ammunition, or dangerous weapon (the no-weapons order);

(4) damaging, defacing, or marking any public or private property (the no-graffiti order);

(5) possessing or using any controlled substance without a prescription or selling or knowingly participating in the sale of any controlled substance (the stay-away-from-drugs order);

(6) possessing or knowingly remaining in the presence of anyone possessing an open container of alcohol, where such possession occurs in a place accessible to the

16

public, except on the premises of establishments licensed to serve or sell alcohol (the stay-away-from-alcohol order);

(7) remaining in a public place or establishment open to the public or vacant lot between 10:00 p.m. and 6:00 a.m., except when attending certain events, working, or in case of emergency (the curfew order);

(8) being present on or in property not open to the general public except with prior written consent of the owner, owner's agent, or person in lawful possession of the property, or in the presence of and with the voluntary consent of the owner, owner's agent, or person in lawful possession (the no-trespassing order);

(9) failing to obey laws prohibiting violence or interference with property rights or commission of acts creating a nuisance.

DISCUSSION

I

*Summary of Gang Injunction Legal Principles and Standard of Review*

A gang injunction to abate a public nuisance may be issued under the Civil Code (§§ 3479-3480) or under the STEP Act (Pen. Code, § 186.22a). (*People ex rel. Gallo v. [Carlos] Acuna* (1997) 14 Cal.4th 1090, 1119 (*Gallo v. Acuna*) [public nuisance under the Civil Code].) This case was brought under the Civil Code, which defines a nuisance as "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of . . . any public park, square, street, or highway." (Civ. Code, § 3479.) A public nuisance is a nuisance "which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) Public nuisances are

17

misdemeanors. (Pen. Code, §§ 372-373a.) A civil action to abate a public nuisance may be brought by a district attorney on behalf of the people. (Code Civ. Proc., § 731.)

Where the action is based on gang activity, plaintiff must show (1) the group is a criminal street gang, (2) its members engage in public nuisance activities, and (3) the individuals being subjected to the injunction are active members of the gang. (*People v. Englebrecht* (2001) 88 Cal.App.4th 1236, 1258 (*Englebrecht*) [permanent injunction], citing *Gallo v. Acuna, supra*, 14 Cal.4th at p. 1125 [preliminary injunction].)

A criminal street gang is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated criminal offenses including assault, robbery, and felony vandalism], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f).) For the purposes of a gang abatement injunction, the test is public nuisance activity rather than criminal activity (*Englebrecht, supra*, 88 Cal.App.4th at p. 1258), but in this case the public nuisance activity consisted mainly of crimes. "In order to prove the existence of a criminal street gang in a given case, it is of course necessary to concentrate on the activities of those alleged to be members. A criminal street gang can act only through its members. [Citation.]" (*Acuna I, supra*, 182 Cal.App.4th at pp. 874-875, citing *Englebrecht, supra*, 88 Cal.App.4th at pp. 1260-1261.)

"[I]n order to enforce a gang injunction against an alleged member, it must be shown the person 'participates in or acts in concert with an ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of acts constituting the enjoined public nuisance, having a common name or common identifying sign or symbol and whose members individually or collectively engage in the acts constituting the enjoined public nuisance. The participation or acting in concert must be more than nominal, passive, inactive or

18

purely technical.' [Citation.]" (*Acuna I, supra*, 182 Cal.App.4th at p. 875, citing *Englebrecht, supra*, 88 Cal.App.4th at pp. 1260-1261.) Of necessity, the definition of active membership cannot be very specific. (*Acuna I, supra*, 182 Cal.App.4th at p. 884.) It is not likely criminal street gangs maintain rosters of their active members. (*Ibid.*) Some factors to consider are self-identification, gang tattoos, crimes committed with other gang members, information from reliable informants, clothing, accessories, photographs, and close association with known gang members. (*Ibid.*) We held this definition of active gang member is not unconstitutionally vague. (*Acuna I, supra*, 182 Cal.App.4th at pp. 883-884.)

The injunction may not burden the constitutional right of association more than is necessary to serve the significant governmental interest at stake. (*Gallo v. Acuna, supra*, 14 Cal.4th at pp. 1115, 1120-1122.)

The importance of the interests affected by the injunction, i.e., constitutional due process and general public policy considerations, requires that the finding of facts necessary to justify its issuance be proved by clear and convincing evidence. (*Acuna I, supra*, 182 Cal.App.4th at p. 873; *Englebrecht, supra*, 88 Cal.App.4th at pp. 1254-1256.) Here, the trial court correctly applied the clear and convincing evidence standard.

On review of a trial court's decision to grant an injunction, we apply the abuse of discretion standard, but we review the trial court's factual findings under the substantial evidence standard, resolving all factual conflicts and credibility questions in favor of the prevailing party and indulging all reasonable inferences in support of the injunction. (*Gallo v. Acuna, supra*, 14 Cal.4th at pp. 1109-1110; *Acuna I, supra*, 182 Cal.App.4th at pp. 878-879.) We review questions of law de novo. (*People ex rel. Totten v. Colonia Chiques* (2007) 156 Cal.App.4th 31, 38 (*Totten v. Colonia Chiques*).) While constitutional issues are always subject to independent review, we do not on appeal reweigh the evidence before the trial court or determine the credibility of witnesses. (*Acuna I, supra*, 182 Cal.App.4th at pp. 878-879.)

19

## II

### *Claims of Evidentiary Error*

While appellants describe the challenged gang evidence as inflammatory, we are mindful that this case does not involve a jury, but rather a bench trial in which the trier of fact was a judge capable of weighing the evidence without being influenced by its inflammatory nature. (*In re Hernandez* (1966) 64 Cal.2d 850, 851.) The trial court expressly noted this point.

Appellants claim the trial court made multiple prejudicial evidentiary errors. We generally review the trial court's evidentiary rulings for abuse of discretion, though when the issue is whether admission of evidence violated the federal Constitution, we review the matter de novo. (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553.)

Under a heading that erroneous admission of evidence in violation of federal constitutional due process rights renders a trial "fundamentally unfair," appellants make catch-all arguments that the trial court erroneously allowed "virtually all evidence" regardless of its irrelevance, inflammatory nature, and prejudicial effect and allowed all victims' hearsay statements as spontaneous utterances. Appellants "must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the [trier of fact] may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the [trier of fact] must have used the evidence for an improper purpose.' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 (*Albarran*).)

### A. *Appellants' "Standing" Re: Non-appellants*

In its respondent's brief, plaintiff argues the eight appellants lack standing to challenge hearsay statements of other gang members. Plaintiff cites *Acuna I*, where we

said the appellants -- named defendants found to be "active members" -- lacked standing to challenge the definition on behalf of persons not before the court. Here, however, the issue is different. Appellants are entitled to challenge use of evidence of other people's out-of-court statements to prove as a factual matter that Broderick Boys is a criminal street gang whose members engage in public nuisance activities -- facts which are necessary to the permanent injunction to which appellants are being subjected.

B. *Deferred Ruling*

Appellants complain the trial court improperly deferred ruling on hearsay objections until the end of trial, allowing plaintiff to "connect the dots" linking actors to the gang. Appellants present no legal authority that deferred ruling constitutes reversible error.

The trial judge has inherent and statutory authority to control the order of proceedings, regulate the order of proof, provide for the orderly conduct of the proceedings, and control the litigation. (Evid. Code, § 320 [court in its discretion shall regulate order of proof]; Code Civ. Proc., § 128, subd. (a)(3) [court has power to provide for orderly conduct of proceedings]; *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402 (*Rayii*) [allowing defense witnesses to be called out of order was not abuse of discretion].) The trial court's exercise of such powers will not be disturbed on appeal absent a clear showing of abuse of discretion. (*Rayii, supra*, 218 Cal.App.4th at p. 1413.)

Appellants fail to acknowledge the trial judge's authority and fail to show abuse of that authority. Appellants assert the court "never did rule" on the objections "except impliedly" in the statement of decision where the court stated plaintiff had proved specified persons were Broderick Boys and therefore admitted their statements. So appellants admit the court did rule.

Appellants say they did a word search of the trial transcript and found 145 references to "defer[red] ruling" or "connect[ing] dots." They claim the court

21

erroneously admitted 43 incidents with no conceivable bearing on this case. They then simply tell us to "See, Crimes Addendum for list of 'continuing objections' based upon relevance and hearsay admissions." A list of their continuing objections does not meet their burden on appeal to demonstrate prejudice warranting reversal of the judgment.

Appellants argue the deferred rulings prejudiced them in four ways. First, they had to decide whether or not to cross-examine the witnesses on the incidents whose relevance and admissibility was undetermined, thereby potentially inviting damaging testimony. Second, appellants assert they did not know until the conclusion of trial whether it would be necessary to introduce rebuttal evidence on the admissibility of which the court deferred ruling. Third, appellants never knew on what evidence the court would base its decision. Fourth, appellants say they could not craft a final argument or briefing in support of a decision without knowing what evidence had been admitted during trial.

However, appellants (1) fail to show they were forced to elicit damaging testimony, (2) fail to show they were precluded from introducing any rebuttal evidence they wanted to adduce, (3) fail to show the trial court was required to give advance notice of what evidence it would find persuasive, and (4) fail to show that they were denied the opportunity to make whatever points they wanted to make.

We conclude appellants fail to show grounds for reversal based on the deferred rulings.

Moreover, we note appellants use the deferral to misrepresent matters on appeal. They argue they were prejudiced by evidence of nuisance activities committed by persons who ultimately were not included on the court's list of active gang members. However, the exclusion of those people from the list means the trial court found they were not active gang members and therefore disregarded that evidence.

22

C. *Hearsay Statements of All Alleged Gang Members*

Without addressing any specific evidence in the discussion portion of their opening brief (other than massive footnotes listing objections without context or analysis), appellants claim the trial court erred in allowing all hearsay statements of *all* alleged gang members.

On this point and others, appellants ignore basic rules of appeal: "[T]he trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited. [Citations.] [¶] It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf. [Citation.] [¶] . . . And the appellant must present each point separately in the opening brief under an appropriate heading, showing the nature of the question to be presented and the point to be made; otherwise, the point will be forfeited. [Citations.] This rule is 'designed to lighten the labors of the appellate tribunals by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass.' [Citation.]" (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656 (*Keyes*).)

Despite the defects in appellate presentation, we attempt to discern whether appellants present any viable claim of reversible evidentiary error. There are two categories of gang-member hearsay declarants: (1) individuals named as defendants and found by the trial court to be Broderick Boys active members, and (2) individuals *not* named as defendants but who were found by the trial court to be active members of defendant Broderick Boys at the relevant times.

23

1. *Hearsay of Individuals Named as Defendants*

Evidence Code section 1220 provides, "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

Appellants present no analysis showing error in the court allowing evidence of statements made by the people named as party defendants.

2. *Hearsay Statements of Gang Members Not Named as Individual Defendants*

The gang experts testified to various hearsay statements by alleged Broderick Boys members *not* named as defendants: (1) self-admissions of membership verbally to police and in written jail intake questionnaires, (2) perpetrators' pronouncements during commission of crimes (adduced through victim/witness testimony and/or police testimony relating victim/witness statements), and (3) declarants' conversations with police about gang culture.

As noted in the statement of decision, "[d]uring trial, the court allowed plaintiff to present certain out-of-court statements of alleged Broderick Boys members. The court permitted these statements on the condition that plaintiff prove by the close of its case that the declarants were members of the Broderick Boys and that the statements were, therefore, admissions by party-declarants under Evidence Code section 1220. For the limited purpose of admitting statements in this trial under Evidence Code section 1220, plaintiff has proved, by clear and convincing evidence, that the following [94] persons [including named defendants] were, at the relevant times, Broderick Boys."

The statement of decision does not reference Evidence Code section 1222 (admissibility of hearsay statements by authorized agents), but during trial the court said with respect to one nonparty, "he'd have to be established to be a member of the

24

Broderick Boys.  It would have to be an admission of an agent for the Broderick Boys, the Broderick Boys being a named defendant."

The trial court also ruled the nonparties' hearsay statements were separately admissible to the extent the experts relied on them in forming expert opinions -- a ruling now called into question by *Sanchez, supra*, 63 Cal.4th 665, as we discuss *post*.

Appellants argue the trial court erred in applying Evidence Code section 1220 to declarations of *non-party individuals*, because there was no proof that the gang is an "unincorporated association" or that any declarant was a member as defined by the Corporations Code, or that any declarant was authorized to speak as an agent of Broderick Boys under Evidence Code section 1222.  Appellants fail to offer any legal authority conditioning admissibility on the Corporations Code.

Evidence Code section 1220 allows hearsay "when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."  On its face, this provision requires that the declarant be a party.  The statute thus appears inapplicable to the non-party gang members here, because they were not parties at all, and therefore were not parties in an individual or representative capacity. (But see, *Colarossi v. Coty US Inc*. (2002) 97 Cal.App.4th 1142, 1150 [in wrongful termination action against employer-corporation, hearsay statements of corporation's merchandising director expressing animus against plaintiff were admissible as statements of a party under section 1220].)

Assuming for the sake of argument that the hearsay statements should not have been admitted under Evidence Code section 1220, they may have been admissible under other statutes.  We do not discuss plaintiff's suggestion that they were admissible under Evidence Code section 1230 as declarations against interest by persons unavailable as witnesses, because plaintiff does not show unavailability (other than Angel Sanchez).  But Evidence Code section 1224 provides:  "When the liability, obligation, or duty of a

25

party to a civil action [here, named-defendant Broderick Boys] is based in whole or in part upon the liability, obligation, or duty of the declarant, . . . evidence of a statement made by the declarant is as admissible against the party as it would be if offered against the declarant in an action involving that liability, obligation, duty, or breach of duty." Here, statements by nonparty Broderick Boys members would be admissible against them had they been named as defendants and thus were admissible because Broderick Boys' liability was based in part on liability of their active members. Evidence Code section 1223 makes hearsay admissible if the statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy.

The trial court impliedly referenced the latter statute by stating admission of the hearsay statements would be subject to plaintiff "connecting dots" to show the declarants were indeed Broderick Boys members, and "This is not unlike a case where parties attempt to prove a conspiracy, and we can't get all the facts in through one witness or one piece of evidence, and it's the totality of the evidence that will permit it."

Appellants argue that, according to rules of vicarious liability for conspiracy, a gang member's hearsay statement cannot be used to impose liability on *another* gang member for pursuit of a common purpose in the absence of independent evidence of concerted action. Although appellants present this as a claim of evidentiary error, it is really a claim of insufficiency of the evidence. Either way, it fails. Appellants quote from *Davis v. Superior Court of Marin County* (1959) 175 Cal.App.2d 8: "The fact of conspiracy cannot be proved by evidence of extra judicial declarations of an alleged conspirator. [Citation.] Only after and upon the proof of the conspiracy itself can such declarations be admitted . . . . The conspiracy cannot be built upon imposed vicarious responsibility for other persons' declarations to whom a defendant has not been related by some showing of *common action*." (*Id*. at pp. 24-26 [criminal case alleging attorney

26

conspired with incarcerated client to remove from prison and publish a manuscript written by client]; italics added.)

Appellants fail to show that any of them was found to be subject to the injunction based on hearsay *of another gang member*. Appellants claim they "demonstrate in the analysis of the hearsay admitted and its impact on their defenses, the use of statements by *other* named defendants, as well as non-parties against them, in the absence of common action, was highly prejudicial, since it tended to show that there was complicity between identified gang members in creating or contributing to a public nuisance." (Orig. italics.) We see no such analysis of hearsay or impact on defenses in appellants' 114-page opening brief, or in their addenda for that matter. For example, their Crimes Addendum Objections Index asserts, "[appellant] Billy Wolfington's home searched [in March 2008], pills found. Admitted over Defendants' continuing objection that the incident was **irrelevant** [citation to record] and **hearsay not qualifying as a party admission**." (Orig. emphasis.) This assertion on its face involves no hearsay by Billy Wolfington. Moreover, the only citation to the record involves police officer testimony about a different person at a different time.

In any event, there was ample evidence of common action, and the record shows, as to each appellant, evidence other than hearsay *of another gang member*. For example: (1) Timothy Acuna admitted to police his membership in Broderick Boys, pleaded no contest to vehicle theft with intent to assist the criminal street gang, and has a BRK tattoo; (2) Alex Estrada had multiple guns and ammunition in his home in January 2007, was in a stolen car with Timothy Acuna in February 2007, and in 2007 "self-admitted" at jail that he is a "Northerner" (aka Norteno); (3) Jesse Garcia wrote "Broderick Boys" on a jail intake form that asked him about his gang membership; (4) Robert Montoya has Broderick Boys tattoos and told his parole agent as recently as five months before trial that he is a Broderick Boys leader; (5) Michael Morales in jail intake forms admitted being a Broderick Boys member; (6) Guillermo Rosales was apprehended by police in

27

possession of a firearm in a car with three other Broderick Boys, and he admitted being a Northerner in jail questionnaires; (7) Felipe Valadez, Jr., pleaded no contest to criminal street gang activity in March 2007; and (8) Billy Wolfington admitted gang membership to police, was arrested with drugs in the company of gang member Raymond Corona, has a 2002 criminal conviction for drugs with a gang enhancement, and has Broderick Boys tattoos.

While appellants want us to disregard this evidence and credit their evidence that they recanted or explained away their admissions (e.g., that jail intake forms do not prove membership), that violates the standard of review on appeal. (*Gallo v. Acuna, supra*, 14 Cal.4th at pp. 1109-1110; *Acuna I, supra*, 182 Cal.App.4th at pp. 878-879.)

Assuming evidentiary error, appellants fail to show grounds for reversal because they fail to show prejudice. Appellants acknowledge there is no prejudice under state law unless it appears reasonably probable they would have obtained a more favorable result absent the errors. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; Evid. Code, § 354; *Winfred D. v. Michelin North America, Inc*. (2008) 165 Cal.App.4th 1011, 1038.)

Appellants' prejudice argument blends different issues. They assert under a separate heading labeled "prejudice" that "There can be little question that the hearsay statements of the identified non-party Broderick Boy/Norteno gang members, gang members identified as Defendants, and the spontaneous statements of crime victims were crucial to the People's case, and prejudicial to the Defense." Appellants drop a footnote exhorting us to "See, Crimes Addendum Objections Index and Gang Members Addendum Objections Index for identification of most of the hearsay statements." Appellants then argue the experts' use of "self-admission" of gang membership to infer existence of a gang entity to which such persons belonged and were complicit in each others' activities, used "entirely circular" inferences -- gang membership was used to prove the existence of a gang entity, which led to the further inference that individuals knew of its existence and were therefore members. Appellants argue that, without self-

28

admissions, plaintiff's case would have been "considerably weakened, even though there was other evidence, such as tattoos or association, which were used to link individuals to the supposed gang." Moreover, say appellants, the hearsay statements were important in showing the various crimes committed by such "self-admitted" members were relevant to the "pattern of conduct" which was found to constitute the nuisance attributed to the gang and its members, whether or not they were gang related. Appellants again invite us to "See" their addenda.

Appellants' prejudice argument is abysmally deficient. They fail to show that any nonparty's self-admission was the sole evidence of membership. For example, the Objections Index says with regard to Christopher Castillo: "Admitted he is a member of the Broderick Boys and his moniker is 'Cricket;' in 2009, a police report alleges that he assaulted a victim and stated 'Hey, are you scraps? And you fuckers think you're hard. Broderick bitch.' [Citation to record.] Admitted over Defendants' objection that the statements were hearsay not qualifying as party admissions. [Citation to record.]" (Emphasis omitted.) However, appellants' prejudice argument ignores other evidence involving Castillo, such as his criminal conviction of a March 2009 gang activity offense (case No. 09-1349) and victim testimony about being assaulted by Castillo in the March 2010 fight at Memorial Park. Appellants cite no authority that Memorial Park's location outside the safety zone precludes consideration of this crime in determining whether Castillo is a Broderick Boys gang member engaging in public nuisance activities.

Appellants cite no instance where membership was based solely on self-admission. In each instance of an admission of gang membership by a person not named as defendant, there was also other evidence, such as criminal convictions or gang tattoos. Appellants acknowledge tattoos but sweep under the rug the compelling, unchallenged, multiple final criminal convictions -- including for gang activity and gang enhancements. Appellants fail to support their claim that, without self-admissions, the convictions lose relevance. Even convictions for crimes without gang-related offenses or enhancements

29

are relevant. As we have stated, "conduct not amounting to a *gang* crime under Penal Code section 186.22 may be the subject of an action to abate a nuisance. [Citation.]" (*Acuna I, supra*, 182 Cal.App.4th at pp. 879-880; italics added.) Additionally, absence of prejudice is apparent in that the trial court did not accept plaintiff's evidence wholesale but made individual determinations that some individuals were *not* Broderick Boys members despite plaintiff's allegations that they were.

Appellants fail to demonstrate that any evidence was used in an improper way that prejudiced appellants. They direct us to their "Objections Index," which is exceedingly unhelpful. For example, one entry states: "William Ybarra, Tyson Ybarra, and Gregory Osio[] contacted standing near a shotgun. Admitted over Defendants' continuing objection that the incident was irrelevant [citation to record] and hearsay not qualifying as a party admission [citation to record.]" (Emphasis omitted.) On its face, this entry contains no hearsay. If we follow the trail to the reporter's transcript, we find police officer testimony that William Ybarra (whom the court noted was no longer a defendant, having being dismissed) admitted he possessed the gun. However, the officer also testified he saw William Ybarra drop the gun. So any error regarding Ybarra's admission was clearly harmless.

As another example, the Objections Index states: "Benny Macias and William McFadden present at a stabbing, search of home and persons located red clothing and marijuana. Admitted over Defendants' continuing objection that the incident was irrelevant and hearsay not qualifying as a party admission." (Emphasis omitted.) Again, the entry on its face contains no hearsay. The entry fails to cite to the reporter's transcript.

Additionally, appellants' Objections Index includes items related to individuals who do not appear on the court's list of gang members, which means the trial court disregarded that evidence due to plaintiff's failure to "connect the dots." Yet appellants include those items in the Objections Index prepared for this appeal, as if they could

30

constitute grounds for reversal. Also, some of the items in the Objections Index contain no citation to the reporter's transcript.

Appellants fail to show reversible error.

Appellants claim erroneous admission of the evidence of gang members not named as defendants violated federal constitutional due process rights and rendered the trial fundamentally unfair (*Albarran, supra*, 149 Cal.App.4th at pp. 229-230), but appellants fail to show a due process violation or fundamental unfairness. They "must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the [trier of fact] may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the [trier of fact] must have used the evidence for an improper purpose.' [Citation.]" (*Albarran, supra*, 149 Cal.App.4th at p. 229.)

Appellants make catch-all arguments that the trial court erroneously allowed "virtually all evidence" regardless of its irrelevance, inflammatory nature, and prejudicial effect. Appellants offer no specifics of prejudice. They cite *Albarran, supra*, 149 Cal.App.4th 214, as having reversed a conviction, but they fail to acknowledge distinguishing features. *Albarran* reversed a conviction for attempted murder, shooting at a dwelling, and attempted kidnapping for carjacking, with gang enhancements, where the trial court improperly allowed certain gang evidence (about Mexican Mafia, threats to police, and unrelated crimes by other gang members). (*Id*. at p. 217.) The trial court believed the evidence was relevant to motive or intent for the charged offenses, even though it was insufficient to prove the gang allegations. (*Ibid*.) The appellate court held that the specific evidence had "no legitimate purpose" in the trial, and "there was a real danger that the jury would improperly infer that whether or not Albarran was involved in these shootings, he had committed other crimes, would commit crimes in the future, and

31

posed a danger to the police and society in general and thus he should be punished." (*Id.* at p. 230.)

No such danger appears in this case, and the evidence did have a legitimate purpose in this public nuisance trial.

We see no basis for reversal for evidentiary error regarding statements by Broderick Boys members.

D. *Hearsay Statements of Victims/Witnesses*

Appellants acknowledge Evidence Code section 1240 authorizes admissibility of a hearsay statement if it "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." They acknowledge case law (e.g., *People v. Pirwani* (2004) 119 Cal.App.4th 770, 789) that such statements are admissible because they are presumptively reliable due to lack of opportunity for reflection, and the declarant's state of mind is crucial.

Appellants then argue: "While in many cases the People's police witnesses testified that the declarants [crime victims and witnesses] looked upset, all the hearsay statements were made in response to police questioning of victims/witnesses. [Italics omitted.] (See, Crimes Addendum, Objections Index.) [¶] Early in the trial, the Defense objected to the court's spontaneous statement rulings and provided formal briefing on the subject. (3AA 595-597) After consideration of the Defense briefing, the court denied the objections ([2]RT 369:4-374:25 [*sic* 376]) and continued to admit hearsay statements as spontaneous statements[,]" which "constitutes reversible error [citation] because it resulted in the improper admission of evidence that was prejudicial and unfair."

Appellants forfeit any challenge to hearsay statements of crime victims and witnesses by failing to present any factual or legal analysis. If appellants mean to suggest, without analysis, that statements in response to police questioning presents a

32

Confrontation Clause issue, the point fails because the Confrontation Clause applies only in criminal cases (*People v. Otto* (2001) 26 Cal.4th 200, 209, 214 (*Otto*)), and this is a civil case. Moreover, appellants' reference to their 16-page "Objections Index" is insufficient. It is not limited to victim/witness statements and merely says victims "alleged" things (e.g., that an appellant punched a victim and stole his bike) over defense objections that the hearsay statements did not qualify as spontaneous statements. This does not satisfy appellants' burden to demonstrate error, much less reversible error. The pages of the reporter's transcript referenced in appellants' brief reveal only one incident, in July 2006, where a victim told police -- about 10 minutes after it happened -- that defendants Rainey Martinez and Robert Sanchez assaulted the victim in his home, broke a stereo speaker, and stole some items. The trial court found it qualified as a spontaneous statement, reconsidered at defense request, and again found it qualified as a spontaneous statement. The appellate brief does not discuss these facts or present any analysis as to why the ruling was wrong. The reference to a trial brief in the clerk's transcript is improper appellate briefing (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 334 (*Garrick*) [appellant cannot simply incorporate by reference arguments made in trial court]). Moreover, the document is merely a request for reconsideration arguing there was insufficient indicia of reliability of statements in response to police questioning after opportunity to reflect.

Appellants develop no legal analysis or authority regarding their point that victims and witnesses were responding to police questioning. Forty pages later in their opening brief, appellants assert in a subheading (under a heading about due process violations rendering trials "fundamentally unfair") that the hearsay statements from crime victims deprived defendants of the opportunity for cross-examination. The single paragraph under this subheading in their appellate brief contains no legal analysis or authority whatsoever. The matter is forfeited. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)

As we admonished this same attorney in *Acuna I, supra*, 182 Cal.App.4th at p. 879: "It is not the function of this court to comb the record looking for the evidence or absence of evidence to support defendants' argument. [Citations.]" It is also not the function of this court to comb through hundreds of pages of scorched-earth briefing to try to make appellants' case for them. (*Lewis, supra*, 93 Cal.App.4th at p. 116.)

Since appellants fail to show any evidentiary error regarding victim statements, i.e., that the statements were inadmissible hearsay, any reliance by the gang experts on such statements would not be problematic under *Sanchez*, because *Sanchez* restricts only reliance on inadmissible hearsay.

E. *Hearsay as Basis for Expert Opinion (Sanchez)*

The trial court allowed hearsay of nonparties alleged to be Broderick Boys members as a basis for expert opinions that the declarants were Broderick Boys members and engaged in nuisance activities and that Broderick Boys had organization and structure.

The trial court overruled defense objections pursuant to the rule that experts may rely on hearsay in forming their opinions. (Evid. Code, §§ 801-802; *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*) [hearsay statements used as a basis for expert opinion are not offered for their truth but instead are offered merely to evaluate the expert's opinion].)

While this appeal was pending, the California Supreme Court disapproved *Gardeley* "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) An expert may be asked to assume hypothetically a set of case-specific facts for which there is independent competent evidence, and then be asked what conclusions the

34

expert would draw from those assumed facts. But if no competent evidence of a case-specific fact has been, or will be, adduced, the expert cannot be asked to assume it. (*Id.* at pp. 676-677.) *Sanchez* restored the common law rule the expert is not permitted to supply case-specific facts. (*Ibid.*) This aspect of *Sanchez* concerning state evidentiary rules for expert testimony applies in civil cases such as this nuisance lawsuit.

*Sanchez* also held that *in criminal cases*, the Sixth Amendment right to confront and cross-examine witnesses (*Crawford v. Washington* (2004) 541 U.S. 36) limits an expert witness from relating case-specific hearsay content in explaining the basis for his or her opinion. (*Sanchez, supra*, 63 Cal.4th at pp. 679-686.) However, *Sanchez* expressly stated its constitutional rule does not extend to civil cases. "Because *Crawford* is based on the Sixth Amendment right to confrontation, its rule has not been extended to civil proceedings . . . ." (*Sanchez,* at p. 680, fn. 6.)

*Sanchez* reversed the street gang enhancements because of the Confrontation Clause violation, not because of the state Evidence Code. (*Id.* 63 Cal.4th at p. 699.)

We allowed supplemental briefing on what effect, if any, *Sanchez* has on this case. Our order calling for supplemental briefs alerted the parties, by citation to *Otto*, *supra*, 26 Cal.4th at pp. 209, 214 (involuntary commitment of sexually violent predator), that the Confrontation Clause does not apply to civil cases, though there may be a confrontation component to due process principles applicable in civil litigation. Appellants' supplemental brief did not develop a due process argument.

Appellants' supplemental brief mentions multiple hearsay about a crime, to which Officer Labin Wilson testified as a gang expert in plaintiff's rebuttal case, to support his opinion that nonparty Chris McDaniel was an active Broderick Boys member. The crime was an assault that occurred in the safety zone on November 6, 2010 (during trial) that later caused the death of the victim. Wilson reviewed police reports and participated in the investigation. In the early morning on November 6, 2010 (about five weeks before completion of this trial), police found a bloody, unconscious male in a parked vehicle on

35

Fremont Street. He later died. Police learned the victim had been at a party at the Fremont Street home of validated Broderick Boys member Juan Zinzun.

Over defense objection, the trial court allowed Officer Wilson to testify to case-specific facts that included hearsay. Witnesses at the party told police that (Rumaldo) Samuel Rios punched the victim in the face at the party, after being given the "green light" to "take out" the victim by Chris McDaniel, who said the victim had been talking about "snitching" on McDaniel at the market where they both worked. Gang-related graffiti threats ("BRK" and "You're next D") were found written at the market. Rios was on a *Yuba City* Police Department's list of validated Norteno gang members. A witness told police that Rios said, "it was either Chris or I had to do it."

Officer Wilson opined McDaniel is a Broderick Boys gang member based on the following facts. When Wilson and other officers arrested McDaniel, McDaniel was wearing red clothing and a hat with a red "B"; he had a "B" tattooed on his neck, four dots on his arm, "S" and "K" on his calves (which the expert opined stood for "scrap killer" despite the demur of some that it stands for Sacramento Kings). McDaniel told jail staff he was an active Norteno gang member and a validated Broderick Boy (though he was not at that time on WSPD's list). Wilson testified: "And then just the circumstance. That's all supporting indicators that he's a Broderick Boys gang member. [¶] But again, going to the facts of this case, when the subject is at a Broderick Boy[s]-sponsored party, being at Juan Zinzun's house, who is a validated Broderick Boys gang member, and it was for his birthday party, and you have somebody that you've deemed by the gang as a snitch, and then you have an individual who tells somebody else to -- or gives somebody a green light to take that, quote/unquote, snitch out, well, if you have the status within the gang to give an order like that and have it be carried out at this party where other gang members are present, you are displaying a level of status in that gang. I mean, he is giving out orders to somebody to put in work for the gang. [¶] So all that

goes together, in my opinion, he [McDaniel] is an active Broderick Boy[s] gang member."

Plaintiff's counsel asked the expert for his opinion as to what a Norteno gang member would have to do if he wanted to transfer from one region to another. The expert said, "It's not defined. You know, he could know people from that region, but basically you have to -- to be accepted by that new set, they would have to believe that you were loyal and committed to the gang and somebody they could trust. [¶] So whether your reputation preceded you or you had to do something to prove your loyalty and your trustworthiness, you know, it would depend case by case." The common term for proving trustworthiness is "putting in work" for the gang. "[S]omebody who is trying to put in work to prove themselves to the gang, if the gang members told you to take somebody out and you didn't, well, one, that would definitely discredit you as being a member of that gang and, in my opinion, you wouldn't be accepted by the gang. However, conversely, if you did follow through with that work and took that person out, you would prove yourself in a gang -- status within the gang. [¶] So I believe that's the circumstances that took place. There was a group of Norteno gang members having a party. An assignment was given to this guy [Rios] from Yuba City who is already a Norteno gang member, but to put in work for the local set of Broderick Boys, they told him -- they assigned him to take out this person they were looking at as a snitch, and he did it."

The trial court in this nuisance case took judicial notice that criminal charges had been filed for the November 6, 2010, matter -- case No. CRF-10-5649, charging Rios with involuntary manslaughter, aggravated battery, plus gang enhancements, and charging McDaniel with a substantive gang offense as well as the battery and gang enhancement. Though not determinative of this appeal, we note McDaniel filed an appeal from his December 2012 conviction in case No. CRF-10-5649 but abandoned the appeal after we received the trial court record. (C072865) The jury found McDaniel

37

guilty of battery with bodily injury but was unable to reach a verdict on the gang offense or enhancement. The trial court sentenced McDaniel to four years in prison and granted the prosecution's motion to dismiss the gang charge and allegation without prejudice. Rios did not file an appeal, but the clerk's transcript in McDaniel's appeal indicates the jury found Rios guilty of battery with serious bodily injury and assault.

In light of *Sanchez*, much of Officer Wilson's testimony appears problematic, because he assumed the truth of and relied on case-specific facts for which no competent evidence was adduced, i.e., that McDaniel gave a "green light" to Rios to assault the victim for snitching, which meant McDaniel had high status in the gang, and Rios did as directed in order to "put in work" so he could transfer to the Broderick Boys subset.

Nevertheless, assuming the trial court erred in allowing this evidence, we see no prejudice warranting reversal of the judgment. The standard for prejudice applicable to state law error in admitting hearsay evidence is whether it is reasonably probable the appellant would have obtained a more favorable result absent the error. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; Evid. Code, § 354; *Winfred D., supra*, 165 Cal.App.4th at p. 1038; *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 866-867 [erroneous introduction of hearsay through expert's testimony was harmless where non-hearsay supported expert's conclusions], disapproved on another ground in *People v. Ault* (2004) 33 Cal.4th 1250, 1272, fn. 15.)

Due to the abundance of other evidence that Broderick Boys was a criminal street gang engaged in nuisance activities, Officer Wilson's testimony in plaintiffs' rebuttal case was unnecessary. Its main value was to show that nuisance activity was still ongoing at the time of trial. However, even disregarding Wilson's testimony, other evidence demonstrated that nuisance activity continued despite the preliminary injunction -- particularly the Memorial Park incident which occurred only a few months before trial began.

Appellants argue we cannot know how the trial court would have ruled had it excluded the testimony about the November 2010 killing. They quote case law: "If improper evidence under objection has been admitted, it is impossible for this [appellate] court to say how much weight and influence it had in the mind of the trial court in framing its findings of fact. The improperly admitted evidence may have been all-powerful to that effect. As far as this court knows it may have been that particular evidence which turned the scale and lost the case to the appellants. This must of necessity be the rule wherever improper evidence has been admitted *which upon its face tends in any degree to affect the final conclusion of the court*. [Italics added.]" (*Estate of James* (1899) 124 Cal. 653, 655; accord, *Wilson v. Manduca* (1965) 233 Cal.App.2d 184, 189-190.)

However, the quotation specifies it is referring to evidence which *on its face* tends to affect the trial court's decision. Appellants fail to argue or demonstrate that the hearsay about the November 2010 incident, or any other evidence, would on its face affect the trial court's decision, particularly in light of the wealth of other evidence.

Appellants' supplemental brief lists expert opinions to which appellants objected, but they list opinions about general gang culture, not case-specific facts. Appellants' supplemental brief complains the trial court allowed a summary of 108 crimes, which included hearsay, as a basis for expert opinion about the existence of a public nuisance, not being admitted for the truth of the matter. However, evidence of the crimes also included admissible evidence such as criminal court records and victim testimony.

Appellants complain the trial court allowed the expert to opine whether individuals were Broderick Boys members and contributed to a nuisance based on a "power point" collection of information about 52 alleged gang members, including some appellants, culled from various resources, police reports, field interview cards, contacts, photographs, and investigations in which the expert was involved. Appellants fail to show that the judgment results from inadmissible hearsay.

39

F. *Other Claims of "Fundamentally Unfair" Evidentiary Rulings*

1. Appellants claim the trial court demonstrated bias -- assisting plaintiff and obstructing defendants -- by allowing evidence of events that occurred outside the safety zone, i.e. Memorial Park and "maybe" the Amtrak train. Appellants offer no legal analysis or authority on this point. Evidence of these recent events was clearly relevant and probative to refute the defense claim that gang activity had stopped, rendering a permanent injunction unnecessary. That one or both events happened outside the safety zone was relevant and probative of plaintiff's point that the relative lull in activity within the safety zone covered by the injunction was attributable to the deterrent effect of the preliminary injunction rather than a voluntary, good-faith termination of misconduct.

2. Appellants complain the trial court in this 2010 trial denied their motion to exclude events remote in time (before January 2008) and allowed evidence of events dating back to Acuna's car theft in 1997. However, appellants fail to mention the trial court allowed older incidents to prove a history of gang activity in order to rebut defense claims of the nonexistence of a gang. Moreover, remote activities are relevant to the issue whether the persistent and prolonged nature of defendants' activities before issuance of the preliminary injunction support a conclusion that misconduct is likely to recur unless permanently enjoined. (*Feminist, supra*, 32 Cal.App.4th at p. 1659.) The court acknowledged remoteness would go to the weight of the evidence. To the extent appellants believe that exclusion of remote incidents would strip the case of substantial evidence of "active" membership as to any particular appellant, they fail to demonstrate it, as we discuss, *post*.

3. Appellants complain the trial court included in the judgment the individual defendants' "alleged" nick-names or "gang names" (Cartoon, Little Vic, Otter, Kiko, Smokey, Snoopy, Billy, Little Rob, Duke, Rabbit, Savage, Gangster, Shug, and Bouncer),

40

putting them in a bad light without substantiating evidence.  However, there was evidence about the monikers, and they were relatively innocuous.

4.  Appellants complain the trial court refused to order plaintiff to produce a list of "validated" Broderick Boys members and associates, which gang expert Winger maintains and revises weekly.  We agree with plaintiff that appellants forfeit this point by failing to present any legal authority.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Moreover, we see no merit on the facts.  Appellants claim the document should have been disclosed in response to their discovery request, and they did not learn of its existence until trial.  The trial court ruled:  "From what I hear this witness saying is that list is a tickler list.  It is not the source material on which he's rendered his opinion.  It is not the material on which he's based his opinion, and at best would be cumulative. Overruled.  Request denied."  Appellants argue the ruling denied them the opportunity to cross-examine the experts effectively, to discover and present rebuttal witnesses, and denied them "impeaching material."  Appellants fail to explain these supposed deprivations.  Appellants speculate the document may have described an individual as only an "associate" of the gang, which would have undercut plaintiff's proof that the person was an active gang member.  Speculation does not demonstrate error.

We conclude appellants fail to show reversible evidentiary error.

### III

### *Broderick Boys is a Criminal Street Gang*

A.  *"Jural Entity" Subject to Being Sued*

Appellants contend plaintiff failed to introduce substantial evidence that membership in the Broderick Boys gang was by "mutual consent" between the gang and the members which -- according to appellants -- is a prerequisite for Broderick Boys being a "jural entity" capable of being sued and thus capable of being the subject of an injunction.  (Code Civ. Proc., § 369.5 [partnership or other unincorporated association

41

may sue and be sued and members may be joined as a parties]; Corp. Code, § 18035 [unincorporated association means a "group of two or more persons joined by mutual consent for a common lawful purpose"].)

However, defendant Broderick Boys defaulted and is not an appellant. Appellants are individuals. The individuals' susceptibility to a civil injunction enjoining a gang's public nuisance activities is not dependent on the gang being a party. Thus, *Gallo v. Acuna, supra*, 14 Cal.4th 1090, upheld a civil injunction where the complaint named only gang members, not the gang. The Supreme Court said the City's evidence demonstrated it was the gang itself, acting through its membership, that was responsible for the public nuisance, and "[b]ecause the City *could* have named the gangs themselves as defendants and proceeded against them, its decision to name individual gang members instead does not take the case out of the familiar rule that both the organization and the members through which it acts are subject to injunctive relief." (*Id*. at p. 1125.) *Gallo v. Acuna* thus indicated in dictum that injunctive relief may be granted against a criminal street gang.

We applied the Corporations Code to Broderick Boys in a different and limited context in *Broderick Boys, supra*, 149 Cal.App.4th 1506, where we held Broderick Boys street gang was not an "unincorporated association" *for purposes of service of process* (Code Civ. Proc., § 416.40, subd. (b); Corp. Code, § 18220) because the gang had no "lawful purpose" under Corporations Code section 18035. We noted case law has treated gangs as unincorporated associations but also noted those cases did not address "lawful purpose." (*Id*. at p. 1522.) An entity could have both lawful and unlawful purposes, but the People submitted a gang expert's declaration that the gang had no social benefits. (*Id*. at pp. 1512, 1521.)

The Second Appellate District, Division Six, later disagreed with our reasoning in *Totten v. Colonia Chiques, supra*, 156 Cal.App.4th at p. 39, fn. 6. There, the gang was the only defendant. Two individuals who had been served with the injunction intervened,

arguing the gang was not a jural entity capable of being sued, and the judgment could not operate against nonparties. (*Id*. at p. 35.) The appellate court disagreed. It considered persuasive the dictum in *Gallo v. Acuna*, and held that even if a gang had not been formed for a lawful purpose, it still would be capable of being sued as an unincorporated association under Code of Civil Procedure section 369.5. (*Id*. at p. 39.) The Corporations Code definition does not necessarily apply, because Corporations Code section 18000 states definitions in that chapter govern the construction of that title of the Corporations Code. (*Id.* at pp. 39-41.) *Totten v. Colonia Chiques* considered it "highly unlikely" that the Legislature intended criminal street gangs to use Corporations Code section 18035 as a shield against a gang injunction. (*Id*. at p. 40.) The Legislature made criminal street gangs subject to gang injunctions under Penal Code section 186.22a and even authorizes the court to award money damages to be paid from assets of the gang or its members when the court issues an injunction under the general nuisance statute of Civil Code section 3479. (Pen. Code, § 186.22a, subd. (c).) *Totten v. Colonia Chiques* said the criteria applied to determine whether an entity is capable of being sued as an unincorporated association " 'are no more complicated than (1) a group whose members share a common purpose, and (2) who function under a common name under circumstances where fairness requires the group be recognized as a legal entity.' " (*Id*. at pp. 38-39.)

Without any supporting legal authority or analysis (and without acknowledging *Totten v. Colonia Chiques* on this point), appellants assume in their opening brief that Corporations Code section 18035 applies in this context. Even assuming for the sake of argument that it does, plaintiff alleged and the trial court found "mutual consent," and appellants fail to offer any authority or legal analysis on interpretation of the Corporations Code provision that would render the evidence of mutual consent insufficient. They argue that "while individuals indicated their allegiance to the Broderick Boys/Nortenos gang by distinctive regalia and tattoos, as well as, at times,

43

association, admissions and criminal actions, there was no evidence of *mutuality* - no evidence that anyone had been (or had to be) *accepted* into the gang; that the identified gang members shared property or profits with other identified members; that any individual crime was adopted or ratified by those who were not immediate participants; or that supposed members met any requirements or had any obligations whatsoever - other than the 'generational thing' of having family members with similar allegiance or identity. Membership was casual, spontaneous, and self-elective." (Orig. italics.)

However, appellants cite no authority requiring formal acceptance into the gang or that members must share property or affirmatively ratify crimes, or imposing any specific requirements as the *sine qua non* of an unincorporated association. They cite *DeMott v. Board of Police Commissioners* (1981) 122 Cal.App.3d 296, 305-306, which held a purported "film club" was not an unincorporated association so as to escape an ordinance regulating picture arcades open to the public. Anyone could join without restriction by paying one dollar. *DeMott*, which did not even discuss mutual consent, is inapposite.

Appellants note *DeMott* cited a Massachusetts case that a purported residential swim club did not qualify as an unincorporated association, because there were no criteria or restrictive requirements for membership and no mutual relationship of contemplated permanence. (*Ibid*.) Again, however, the court found the purported club was an artifice to avoid regulation as a commercial amusement place, and the case has no bearing here. (*Ibid*.)

Appellants cite another inapposite case, *Motta v. Samuel Weiser, Inc*. (D. Me. 1984) 598 F.Supp. 941, which said in a copyright case that a purported organization did not qualify as a jural entity capable of owning copyrights, where it had no definite membership but was just an amorphous set of ideas and rituals which could be appropriated by anyone so inclined. (*Id*. at pp. 950-951.)

Here, the evidence amply shows "mutual consent" under a common sense understanding of that term. The members share a common purpose and function under a

44

common name under circumstances where fairness requires the group be recognized as a legal entity.  (*Totten v. Colonia Chiques, supra*, 156 Cal.App.4th at pp. 38-39.)

Appellants' reply brief cites *White v. Cox* (1971) 17 Cal.App.3d 824, 826-828, for the proposition that the unincorporated association must be distinct from its membership. However, that case held a condominium homeowners' association was a separate entity from the homeowners such that a homeowner who tripped over a sprinkler in the common area could pursue a tort action against the association.  Appellants fail to show how that case helps them in this appeal.

B.  *Substantial Evidence of Criminal Street Gang*

*Sanchez* does not bar a gang expert from relying on hearsay for general background information.  (*Sanchez, supra*, 63 Cal.4th at pp. 676-677.)  Substantial evidence about gang culture might consist of expert opinion testimony "based . . . on conversations [the gang expert] had with . . . gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies.  [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324, citing *Gardeley, supra*, 14 Cal.4th at pp. 617-618.)  Additionally, the expert's relevant personal observations are admissible.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1034.)

Appellants argue the evidence was insufficient to support expert opinions regarding the gang's alleged organization and collective activity, because the opinions lacked a factual basis.  (*In re Alexander* (2007) 149 Cal.App.4th 605, 612-613 [expert testimony without an adequate foundation does not constitute substantial evidence].)  But appellants fail to show absence of a factual basis.  They split their argument into separate issues of (1) organization, subdivided as (a) history/structure and (b) membership (tattoos/regalia, jumping in, and putting in work); and (2) concerted or collective activity (intimidation, rivalry, and defense of turf).  But the issues overlap.

45

Appellants note Villanueva's testimony about Broderick Boys being a sort of "franchise" of the Nortenos street gang, which developed from the Nuestra Familia prison gang and has policies of hierarchy and collective activity. Appellants posit that, after all these years and countless searches of homes, computers, and cell phones, WSPD has no "evidence of internal organization." But appellants cite no authority requiring documentary proof. Appellants' statement of facts asserts there was little evidence connecting Broderick Boys to the Nuestra Familia prison gang but acknowledges there was evidence connecting Broderick Boys to the Nortenos street gang.

We invited supplemental briefing on the effect, if any, of recent criminal case law regarding gang subsets. (*People v. Prunty* (2015) 62 Cal.4th 59 [prosecution must show connection between gang and subsets where it relies on crimes committed by members of subsets for predicate offenses to prove gang enhancement in criminal case].) Appellants' position is that *Prunty* is inapplicable because that was a criminal case and this is a civil case. We therefore need not consider *Prunty*.

In a two-page footnote, appellants give "examples" of purported lack of factual basis. They claim that no evidence supports Villanueva's testimony that McFadden, as a non-Hispanic, had to do a little bit more to gain membership. Appellants offer no possible way this testimony could have prejudiced them.

Appellants' footnote next complains about evidence of the November 2010 assault where McDaniel gave Yuba City transplant Sam Rios the "green light" to "take out" the victim. As indicated, we do not rely on this evidence to affirm the judgment.

Appellants' footnote goes on to claim expert Villanueva engaged in speculation by opining that Alex Estrada maintained a "weapons cache" for the gang, based on his misdemeanor conviction for possession of ammunition. However, appellants misstate the record. Villanueva based his opinion on the multiple firearms found in Estrada's residence, not on the ultimate conviction. Nuisance activities need not result in criminal

46

convictions in order to constitute evidence warranting a gang injunction. (*Acuna I, supra*, 182 Cal.App.4th at pp. 879-880.)

Plaintiff's experts testified -- based on contacts with Broderick Boys members (which appellants fail to show was improperly allowed into evidence) -- that individuals join Broderick Boys in a variety of ways, e.g., by legacy of having family members in the group, by "jumping in" (allowing themselves to be beaten), and females could join by having sex with members. New members move up within the gang by "putting in work" for the gang, e.g., by selling drugs or committing acts of violence to foster fear of Broderick Boys and avenge disrespect by rivals. Gang expert Winger said Broderick Boys does not have a *formal* organizational structure but has an informal structure in that members who have put in years of work or committed significant crimes on behalf of the gang have more influence and higher standing in the gang, enabling them to give orders to commit crimes. A significant or violent crime requires the approval of a more senior member. Winger opined Broderick Boys has an informal code of conduct, and senior members determine the course of the informal policy. The expert opinions were supported by other evidence, e.g., Angel Sanchez testified in his criminal trial that he put in work for the gang by fighting members of other gangs.

Appellants argue there was no evidence that anyone knew that anyone else was "putting in work." Appellants argue that, while being "jumped in" was a familiar concept "to at least one identified gang member" (Angel Sanchez), only one person "claimed" that she was "jumped in" when she was 11 years old. Appellants argue the "insubstantiality of this childhood incident, based entirely on hearsay by someone who apparently had no history of active gang involvement, hardly needs elaboration. [Citation to addendum.]"

Again, appellants have failed to show prejudicial evidentiary error, and they ignore the multiple final criminal convictions involving joint activities. The evidence supports an inference that members understood Broderick Boys' informal structure and

acted upon it.  Indeed, there was direct evidence from a member -- the transcript of Angel Sanchez's testimony from his criminal case -- in which he admitted being a Broderick Boy and said he had gang tattoos on his face, arms, and hands, and one way to join was to be "jumped in" to the gang, though he himself was not jumped in but joined because he had family members involved in the gang.  Angel Sanchez testified he "put in work" for the gang by fighting members of other gangs.

Appellants fail to show grounds for reversal concerning Broderick Boys as a criminal street gang subject to suit.

IV

*Broderick Boys Engages in Public Nuisance Activities*

Appellants contend the "pattern of conduct" (Pen. Code, § 186.22(f)) found by the trial court to constitute a public nuisance warranting a gang injunction was not attributable to "DEFENDANTS/APPELLANTS" because they did not "act in concert" with the gang to create the pattern.  Appellants claim the result is a due process violation imputing guilt by association.

Appellants raise a variety of contentions conflating two separate but overlapping issues:  (1) whether the gang, through its members, commits public nuisance activities, and (2) whether these eight appellants are active gang members who participate in or act in concert with the gang so as to make them subject to the injunction.  (*Acuna I, supra*, 182 Cal.App.4th at p. 880; *Englebrecht, supra*, 88 Cal.App.4th at pp. 1260-1261.)  We address the latter point, *post*.  For the first point:  "It is the collective action of the gang, not that of any individual member, that determines whether a public nuisance exists." (*Acuna I, supra*, at p. 880.)

As to some of appellants' arguments, we already addressed them in *Acuna I, supra*, 182 Cal.App.4th 866 -- a controlling opinion virtually ignored in appellants' opening brief in this appeal.  The "law of the case" doctrine dictates that an appellate

48

court's holding, on a rule of law necessary to an opinion, must be adhered to throughout the case's subsequent progress in the trial court and on subsequent appeal, as to questions of law (though not as to questions of fact). (*Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, 213.) We need not address appellants' arguments about *Acuna I* raised for the first time in the reply brief. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.)

### A. *Relative Lull in Activity*

Appellants argue that prior nuisance activities are remote, and there was insufficient evidence of current *ongoing* nuisance activities at the time of trial in 2010 to justify injunctive relief. Appellants argue plaintiff thus failed to show the presence of conditions warranting equitable relief. We disagree.

In *Acuna I, supra*, 182 Cal.App.4th at page 879, the defendants argued that most of the crimes were committed years ago. We said: "As to the relative dearth of recent criminal offenses presented in support of the [preliminary] injunction, it must not be overlooked that during all of 2006 and much of 2007 [the default] injunction was in place restricting the activities of the Broderick Boys in the Safety Zone. Also, [gang expert] Investigator Villanueva indicated the crimes he mentioned in his declaration were only 'a sampling of some of the crimes committed by the Broderick Boys in the Safety Zone' that he personally investigated. The trial court was presented with the criminal records of the 23 named defendants, but not other gang members. Furthermore, the other intimidating conduct of the Broderick Boys tends to paralyze the community, which diminishes their need to actually commit further assaults to maintain control." (*Id.* at p. 881.)

The same lulling effect applies in this appeal, where the preliminary injunction has been in place from April 2007 to the present.

Moreover, a permanent injunction is appropriate if the misconduct is ongoing or likely to recur and, while a permanent injunction may be inappropriate where the defendant *voluntarily and in good faith* discontinues the wrongful conduct, compliance with a court order (here, the preliminary injunction) does *not* constitute voluntary discontinuation. (*Feminist, supra*, 32 Cal.App.4th at pp. 1658-1659.) Additionally, remote activities are relevant to the issue whether the persistent and prolonged nature of defendants' activities before issuance of the preliminary injunction support a conclusion that misconduct is likely to recur unless permanently enjoined. (*Id*. at p. 1659.)

In *Feminist*, we upheld issuance of a permanent injunction imposing time, place, and manner restrictions on antiabortion demonstrations at a medical clinic. The demonstrators -- pointing to lack of evidence of the prohibited conduct for more than a year before trial -- argued no evidence suggested the conduct supporting the preliminary injunction would be resumed unless permanently enjoined. (*Id*. 32 Cal.App.4th at p. 1658.) They argued the testimony of one demonstrator that he "would like to resume" did not establish he *would* resume. (*Id*. at pp. 1658-1659.) We rejected the argument. "Because injunction is an extraordinary remedy, the remedy should not be exercised unless it is reasonably probable the acts complained of will recur. 'Injunctive power is not used as punishment for past acts and is ordered against them only if there is evidence they will probably recur. . . . A court of equity will not afford an injunction to prevent in the future that which in good faith has been discontinued in the absence of any evidence that the acts are likely to be repeated in the future.' [Citation.]" (*Id*. at p. 1658.) We concluded "it was reasonable for the trial court to conclude that the prohibited conduct would resume unless permanently enjoined. . . . The nature of the issue involved, plus the persistent and prolonged nature of defendants' activities at the clinic before issuance of the temporary restraining order and preliminary injunction, indicate such conduct was discontinued at least in part because of the legal prohibition. Compliance with a court order is not voluntary discontinuance of prohibited conduct. [Citation.]" (*Ibid*.)

50

Here, the record supports a conclusion that the relative lull in nuisance activity in recent years is attributable to the existence of the preliminary injunction, which plaintiff sought in July 2007 (*Acuna I, supra*, 182 Cal.App.4th at p. 870), and which the trial court issued in May 2008, and which we affirmed for the most part in our opinion in the prior appeal, filed March 8, 2010.

Plaintiff at trial adduced evidence of additional crimes and other nuisance activities showing nuisance activity was continuing, though to a lesser extent than before the injunction. Villanueva testified he observed a reduction in nuisance activity when the injunction was in place and an increase in subjects openly displaying gang tattoos and clothing when the injunction was overturned in the prior appeal in April 2007. Appellants claim there was no basis for the expert to opine cause and effect between the injunction and the level of activity. However, appellants ignore Villanueva's testimony that Billy Wolfington (a named defendant) told Villanueva the injunction was driving Broderick Boys "under ground." Moreover, Villanueva's personal observations about the level of activity and his continued contact with gang officers support an inference the injunction at least partially achieved its purpose of deterring nuisance activity. Appellants offer nothing to render such inference unreasonable.

Winger testified he had the opportunity to observe gang activity before and after the first (default) injunction issued, between 2004 and 2007. Before the first injunction, police commonly encountered Broderick Boys members openly displaying gang tattoos and the red color and openly acknowledging membership. In Winger's personal observations as well as his review of police reports, such overt signs were less common after the injunction issued. After the first injunction was overturned, Winger personally observed an increase in the number of persons openly wearing red and displaying gang tattoos. Winger opined, based on his involvement in and review of drug investigations, that the injunction had no effect on the amount of Broderick Boys' drug activity -- which was ongoing -- but the injunction caused the drug dealing to be less overt, less visible.

51

Winger also said of the injunction "[a]s a tool, it helped us to combat drug trafficking or drug dealing in the Safety Zone."

Appellants deceptively cite Winger's opinion that Austin Nunez and Pauliton Nunez are not "presently" (at the time of trial) contributing to a public nuisance. However, Winger also testified those individuals are presently (at the time of trial) incarcerated.

Additionally, the trial court in this case expressly stated remoteness would go to the weight of the evidence. Appellants fail to show any error.

## B. *Inside or Outside the Safety Zone*

If appellants mean to argue that nuisance activities taking place *outside* the safety zone cannot be considered -- and it is not at all clear that they do -- they forfeit the point by failing to develop any legal analysis. While the default injunction and preliminary injunctions were in place, the Broderick Boys' stepping outside the safety zone boundary for some of their nuisance activities supports an inference of an attempt to evade the reach of the injunction, hence supports the ongoing need for the injunction.

## C. *Collective Action Versus Isolated Acts by Sole Actors*

### 1. *Issues Concerning Legal Standard*

Appellants argue the trial court erred in considering any crime committed by a single person acting alone. Appellants appear to believe that isolated acts by individuals acting alone cannot be used to find a public nuisance justifying a gang injunction, absent proof the acts are gang-related and each member committed multiple acts. Appellants cite no authority supporting their position that each member must commit multiple acts.

In *Acuna I*, the defendants contended that plaintiff failed to demonstrate the activities of alleged gang members were anything other than isolated instances of bad conduct, and some of the crimes were relatively minor and only six involved a gang-related conviction. (*Id.*, *supra*, 182 Cal.App.4th at p. 879.)

52

We said, "conduct not amounting to a *gang* crime under Penal Code section 186.22 may be the subject of an action to abate a nuisance. [Citation.]" (*Acuna I, supra*, 182 Cal.App.4th at pp. 879-880; italics added.) "[I]n the context of a gang injunction, it is not necessary to prove the commission of criminal acts. Rather, it must be shown gang members 'participate[] in or act[] in concert with an ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of acts constituting the enjoined public nuisance, having a common name or common identifying sign or symbol and whose members individually or collectively engage in the acts constituting the enjoined public nuisance.' [Citation.] Thus, conduct not amounting to a *gang* crime under Penal Code section 186.22 may be the subject of an action to abate a nuisance. [Citation.]" (*Ibid.;* italics added, orig. italics omitted.) We said the evidence showed that individual Broderick Boys members vandalize property with gang graffiti, intimidate residents with gang signs, tattoos and red clothing, and patrol the safety zone in small groups, thereby reinforcing their control of the area. (*Id*. at p. 880.) The individual crimes were merely the more serious types of conduct used by the Broderick Boys to "maintain control of their turf." (*Ibid*.) There was no need to link any particular gang member to the gang graffiti in the safety zone for purposes of a gang injunction. (*Ibid*.) It may reasonably be assumed such graffiti was the work product of some member of the gang, even if that member cannot be identified.[2] (*Ibid*.) "It is the collective action of the gang, not that of any individual member, that determines whether a public nuisance exists." (*Ibid*.) We also said the defense argument presupposed that a crime that is not *charged* as a gang offense is not gang-related, but there were many reasons why a prosecutor may choose not to add a gang charge. (*Id*. at p. 881.) "Even crimes that were not technically committed for the purpose of benefitting

---

[2] At trial, the defense objected to relevance of graffiti of unknown authorship but acknowledged our prior opinion as law of the case.

a gang may nevertheless have that effect. Furthermore, a gang injunction may properly prohibit conduct of gang members irrespective of whether that conduct is undertaken to further the purposes of the gang. [Citation.]" (*Ibid*.)

In this appeal, appellants appear to suggest that *Gallo v. Acuna, supra*, 14 Cal.4th 1090, stands for the proposition that only *collective* activities can constitute a public nuisance. We disagree. There, the defendants -- who admitted gang membership or whom police identified as gang members -- argued they could not be subject to a gang injunction (which differs from the question whether a public nuisance exists) unless they possessed a specific intent to further the gang's unlawful purpose. (*Id*. at pp. 1122-1123.) The Supreme Court instead concluded it was enough that sufficient evidence supported the conclusion that the gang and its members were responsible for the nuisance and that each individual defendant admitted gang membership or was identified as a gang member. (*Id*. at p. 1125.)

*Englebrecht, supra*, 88 Cal.App.4th at page 1261, said it does not appear that *Gallo v. Acuna* requires for a sufficient demonstration of membership any showing the individual had engaged in nuisance activities.

Appellants cite *People v. Rodriguez* (2012) 55 Cal.4th 1125, for the proposition that membership in a gang is not enough to establish in an individual vicarious liability for a gang's pattern of conduct, because of constitutional concerns about guilt by association. *Rodriguez* -- which was published after the bench trial in this case -- was not a civil gang injunction case, but rather a criminal conviction for attempted robbery and the separate felony of gang participation under Penal Code section 186.22, subdivision (a). The Supreme Court, affirming our reversal of the gang participation conviction, said the defendant's commission of attempted robbery while acting alone did not fall within the elements of the gang participation offense, which requires willful promoting, furthering, or assisting in felonious criminal conduct by "members" of the gang. (*Rodriguez, supra*, 55 Cal.4th at pp. 1130-1132, citing Pen. Code, § 186.22, subd. (a).)

54

Interpreting the plural "members" to include the singular (Pen. Code, § 7) would not be reasonable in the context of the due process concerns raised by a gang participation statute that does not require the underlying felony to be gang-related. (*Rodriguez, supra*, 55 Cal.4th at pp. 1132-1139.) However, a person acting alone is still subject to the gang enhancement under Penal Code section 186.22, subdivision (b). (*Rodriguez, supra*, 55 Cal.4th at pp. 1138-1139; *People v. Rios* (2013) 222 Cal.App.4th 542, 545-546.)

*Rodriguez* is inapposite here, where the lack of gang enhancement or gang charge in connection with a given criminal prosecution is not determinative for purposes of a civil gang injunction. (*Acuna I, supra*, 182 Cal.App.4th at p. 881.) We are mindful, however, of the constitutional concerns about guilt by association, and we address them *post* in our discussion of active membership.

2. *Substantial Evidence Issues*

If appellants mean to argue insufficiency of the evidence of a public nuisance, we disagree.

Appellants say gang expert Villanueva testified Broderick Boys " 'patrol' (drive around the neighborhood)" to maintain control, but there was insufficient evidence of actual patrolling because there were only two incidents of Broderick Boys "driving around" and one incident of Broderick Boys "flamed out" in gang colors 10 years earlier. However, appellants offer no citation to the record and instead *misstate* the record. Villanueva testified "patrolling" means "these guys are out and about on the streets, *whether by vehicle or on foot* . . . ." (Emphasis added.)

In *Acuna I*, the defendants argued there was no evidence of actual sightings of numerous gang members together in public places within the safety zone. (*Id.* 182 Cal.App.4th at p. 879.) We said, "we need look no further than the declaration of Investigator Villanueva [who] indicated Broderick Boys members typically patrol areas within the Safety Zone in small groups, because a 'guy on the corner isn't going to get

the message of fear and intimidation across to the community and to rival gangs.' Unless we are to conclude Investigator Villanueva simply made this up, it is reasonable to assume he observed this activity within the Safety Zone or it was reported to him by others." (*Id.* at p. 880.) We indulged all reasonable inferences in support of the judgment. (*Ibid.*)

In this appeal, the experts acknowledged they had not seen much patrolling lately. However, there was also evidence that gang members admitted to police that the existence of the preliminary injunction had forced them to go "under ground." Additionally, there was some evidence of recent group activity spreading fear in the community, i.e., the 2010 Memorial Park incident. The trial court believed the testimony of the victims of that incident, that fear of the Broderick Boys forced them to move away. In addition to the victim testimony, plaintiff's experts testified about the reluctance of victims to testify against perpetrators who are gang members, due to the victims' fear of retaliation. This evidence was proper, as recently reaffirmed in *People v. Nguyen, supra*, 61 Cal.4th 1035: " 'Whether members of a street gang would intimidate persons who testify against a member of that or a rival gang is sufficiently beyond common experience' " that expert opinion would assist the trier of fact. (*Id.* at p. 1034, citing *People v. Gonzalez* (2006) 38 Cal.4th 932, 945.)

As noted, appellants cite no authority requiring multiple nuisance activities by each gang member and we can perceive no reason to impose such a requirement. A gang injunction aims to stop a public nuisance -- i.e., a nuisance that affects an entire community (Civ. Code, § 3480) -- by a criminal street "gang" which can act only through its members. (*Acuna I, supra*, 182 Cal.App.4th at pp. 874-875.) It matters not to the community whether each gang member commits multiple acts.

Moreover, this presents another instance of appellants misstating the facts.

Appellants' opening brief states, "for those who were immediate participants in a crime, suspected crime, or who were otherwise known to the police, the vast majority of

56

identified gang members (82 out of 94) appear only once in the record. . . . (See, Crimes Addendum, Crimes Chart, which shows the year(s) each identified gang member appears in the record.) . . . Therefore their nuisance activity cannot be described as 'collective' even with respect to the particular crime or suspected crime. (See, Crimes and Gang Members Addenda.)"

As noted in the respondent's brief, appellants have cited, not to the record, but to a "Crimes Chart" appellants themselves apparently prepared for this appeal -- with no citations to the record whatsoever -- and the chart is wrong. The chart claims Juan Zinzun appeared in the record only once with respect to an incident in the first half of 2002 (Crimes Addendum, Crimes Chart), but Zinzun had *two* gang-related convictions in two separate criminal cases. Appellants' reply brief states: "What counsel meant is that Zinzun was convicted of crimes on one date in the past, and there was no recurrence. And he acted alone, as far as the record reveals." However, "[w]hat counsel meant" is an inadequate excuse for misrepresenting facts in appellate briefing.

Moreover, appellants fail to support their assertions that the convictions were on one date based on one incident, and that the record is confused. Appellants cite their own "Gang Members Addendum at p. Z-1" -- which is not part of the record but rather part of appellants' briefing. The Addendum does claim the offense date in both cases was July 16, 2002. However, the cited pages of the reporter's transcript instead state Zinzun was convicted of assault with a deadly weapon with a gang enhancement in trial court case No. CRF-02-0429, violation date January 16, 2002, plea date July 10, 2002. And he was convicted in case No. CRF-02-5286 of a substantive gang offense committed on *July* 16, 2002, to which he entered a plea on September 26, 2002. Over defense objection, the trial court allowed these convictions as rebuttal evidence to defense testimony of the nonexistence of the gang.

Appellants' reply brief claims respondent's brief admits on page 13 that the two cases were from the same date. However, page 13 contains no such admission.

57

Appellants also (mis)cite their own Crimes Addendum, which summarizes that police contacted Zinzun about an assault, and then states there were two convictions in the two separate cases. The addendum cites to pages of the reporter's transcript, which merely state he was convicted in one case and was later convicted in the second case.

We conclude appellants fail to show reversible error with respect to the trial court's conclusion that Broderick Boys engages in public nuisance activities.

V

*Appellants are Active Members of Broderick Boys*

A. *Legal Definition of Active Member*

In *Acuna I*, we said the defendants failed to make individualized argument regarding their active membership, thereby forfeiting the matter. (*Id.* 182 Cal.App.4th at p. 879.) Here, the argument has been made.

Insofar as appellants complain the judgment's list of active members includes persons other than appellants, appellants "lack standing to challenge that definition [of active member] on behalf of parties not before the court." (*Acuna I, supra*, 182 Cal.App.4th at pp. 883-884.) Appellants may challenge the trial court's findings of non-appellants' active membership insofar as the non-appellants' activities were used to conclude the gang engages in public nuisance activities warranting the injunction to which appellants are subjected, but appellants fail to show reversible error on that ground.

*Gallo v. Acuna* considered who was bound by the preliminary injunction. (*Id.* 14 Cal.4th at pp. 1122-1125.) The Supreme Court concluded for "present purposes" (preliminary injunction), it was enough that sufficient evidence supported the conclusion the gang and its members were responsible for the nuisance and that each of the individual defendants either admitted gang membership or were identified as gang members. (*Id.* at p. 1125.) *Gallo v. Acuna* did not have to decide on a test for

58

determining whether an individual is a member of a gang responsible for nuisance activity such that he may be enjoined or ultimately found in contempt for engaging in enjoined behavior in the target area, as noted in *Englebrecht, supra*, 88 Cal.App.4th at page 1261. *Englebrecht* said, "It does not appear, however, [*Gallo v.*] *Acuna* requires for a sufficient demonstration of membership any showing the individual had engaged in nuisance activities." (*Englebrecht, supra*, 88 Cal.App.4th at p. 1261, citing *Gallo v. Acuna, supra*, 14 Cal.4th at p. 1125.) "[F]or the purposes of a gang injunction an active gang member is a person who participates in or acts in concert with an ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of acts constituting the enjoined public nuisance, having a common name or common identifying sign or symbol and whose members individually or collectively engage in the acts constituting the enjoined public nuisance. The participation or acting in concert must be more than nominal, passive, inactive or purely technical." (*Englebrecht, supra*, 88 Cal.App.4th at p. 1261.) We applied *Englebrecht*'s definition in *Acuna I, supra*, 182 Cal.App.4th at p. 875.)

Appellants argue the injunction's use of *Englebert*'s definition of "active gang member" as someone who "participates in or acts in concert" with the Broderick Boys, is unconstitutionally vague and overbroad and impermissibly penalizes activity protected under the First Amendment and the liberty interests protected under the due process clause.

We already rejected this argument in *Acuna I*. We said that "[o]f necessity, the definition cannot be much more specific. It is not likely criminal street gangs maintain rosters of their active members." (*Id*. 182 Cal.App.4th at pp. 875, 884.) Some factors to consider are self-identification, gang tattoos, crimes committed with other gang members, information from reliable informants, clothing, accessories, photographs, and close association with known gang members. (*Ibid*.)

59

We held the definition of active gang member was not unconstitutionally vague. (*Acuna I, supra*, 182 Cal.App.4th at pp. 883-884.) Two principles guide evaluation of whether a law is unconstitutionally vague. (*Id.* at p. 884.) First, abstract legal commands must be applied in a specific context. (*Ibid.*) A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness. (*Ibid.*) Second, only reasonable specificity is required. (*Ibid.*) "In the context of a gang injunction, only a reasonably specific definition of 'active member' is possible in order to give adequate notice while encompassing those who primarily contribute to creation of the public nuisance. We conclude the definition at issue here is sufficiently specific." (*Ibid.*)

Appellants argue due process prohibits guilt by association and requires proof they acted in concert before they can be held vicariously liable for a pattern of conduct attributed to a gang. Recognition of the constitutional concerns is reflected in that a heightened standard of clear and convincing evidence applies to civil gang injunction cases. (*Englebrecht, supra*, 88 Cal.App.4th at pp. 1254-1255.)

Appellants cite *Scales v. United States* (1961) 367 U.S. 203 [6 L.Ed.2d 782] (*Scales*), which upheld constitutionality of a statute making it a crime to be a member of an organization (the Communist Party), knowing it advocates the overthrow of the United States government by force or violence. *Scales* said, "we can perceive no reason why one who actively and knowingly works in the ranks of that organization, intending to contribute to the success of those specifically illegal activities, should be any more immune from prosecution than he to whom the organization has assigned the task of carrying out the substantive criminal act." (*Id*. at pp. 226-227.) *Scales* added in a footnote: "The problems in attributing criminal behavior to an abstract entity rather than to specified individuals, though perhaps difficult theoretically, as a practical matter resolve themselves into problems of proof. Whether it has been successfully shown that a particular group engages in forbidden advocacy must depend on the nature of the

60

organization, the occasions on which such advocacy took place, the frequency of such occasions, and the position within the group of the persons engaging in the advocacy. [Citation.] Understood in this way, there is no great difference between a charge of being a member in a group which engages in criminal conduct and being a member of a large conspiracy, many of whose participants are unknown or not before the court. Whatever difficulties might be thought to inhere in ascribing a course of criminal conduct to an abstract entity are certainly cured, so far as any particular defendant is concerned, by the requirement of proof that he knew that the organization engages in criminal advocacy, and that it was his purpose to further that criminal advocacy." (*Id.* at p. 226, fn. 18.)

Here, there is no due process problem or guilt by association, because the injunction applies only to active participants. Even if the definition could be construed to be ambiguous in the abstract, that did not happen to any of these appellants, and they therefore fail to show grounds for reversal.

B. *Substantial Evidence of Active Membership*

Under the heading of evidentiary claims, appellants argue: "Defendants/Appellants have not been engaging in current, ongoing nuisance activity; their crimes are in the past, mostly years before the trial. Therefore the prohibition on guilt by association bars the imposition of the restrictions of the injunction upon persons, including Defendants/Appellants, who are only related by supposed gang membership, rather than ongoing action in concert, unless *each such person* had been shown to be engaged in current, ongoing, nuisance activity that justifies and necessitates the particular restriction. '[I]njunction is not the proper remedy to prevent a person from doing an act which he has never undertaken or threatened to undertake . . . .' " (38 Cal.Jur.3d Injunctions § 44 (2013); see also, *Pezold v. Amalgamated etc. Workmen* (1942) 54 Cal.App.2d 120, 127; *San Francisco v. Market S.R. Co.* (1950) 95 Cal.App.2d 648, 655.)

The contention fails. The cited authorities are not on point but merely held there was no basis to enjoin acts that had not happened. Appellants are trying to invent their own standard requiring proof that each individual participates in committing public nuisance acts, whereas the correct standard is that gang members commit public nuisance activities and each individual subject to the injunction participates more than nominally in the gang.

There is plenty of evidence of appellants' active membership. Villanueva opined each appellant is a Broderick Boys member and (unless incarcerated) contributes to an ongoing public nuisance. Villanueva based his opinions on multiple factors, including his training and experience, personal involvement in crime investigations, and contacts with appellants, all of whom are named defendants.

### 1. *Timothy Acuna*

Timothy Acuna admitted Broderick Boys membership when police served him with the injunction in 2005; admitted being a Norteno when he went to jail in February 2007; has gang tattoos (BRK on his stomach, one dot on his right hand and four dots on his left, and XIV); was apprehended driving a stolen vehicle with Broderick Boys Alex Estrada as passenger on February 17, 2007 (case No. CRF 07-982); and pleaded no contest to vehicle theft with intent to assist a criminal street gang.

Appellants' brief falsely claims, "[t]here was no evidence he [Acuna] had been seen in the safety zone in the last several years." However, Acuna's parole agent testified in December 2010 as a rebuttal witness that he saw Acuna at Fifth and C Streets in West Sacramento (within the safety zone) three times, the most recent of which was "[a]pproximately two years ago." On cross-examination, Acuna's attorney represented that Acuna just got out of prison "a few weeks ago" after being in prison continuously for the past four years. After the lunch recess, the parole agent testified on redirect examination that Acuna was taken into custody in 2006 and was paroled in 2008, and the

62

agent testified from recollection refreshed by records from the Department of Corrections and Rehabilitation, that after being paroled in 2008, Acuna was out of custody for some period of time and then went back into custody in 2009 and was paroled in 2010.

Acuna himself testified as a defense witness in this case. He was sent to prison in 2001 for vehicle theft and had previously pleaded to "[m]aybe three" vehicle thefts. When he went to prison for vehicle theft in 2007, Acuna had a "BRK" tattoo on his stomach, which he got in 2002. A couple of weeks before his testimony in this trial, Acuna was arrested when police found a BB gun in his mother's house, but the matter was dropped.

Appellants recite Acuna's trial testimony that he is not a gang member, that he committed his crimes for personal reasons, not to further gang interests, and that the jail classified him as a gang member "just because" he is a Hispanic from Broderick and has tattoos. We disregard Acuna's self-serving testimony because the trial court did not believe him, and on appellate review we resolve all factual conflicts and credibility questions in favor of the prevailing party and indulge all reasonable inferences in support of the judgment.

### 2. *Alex Estrada*

Alex Estrada "self-admitted" being a "Northerner" (aka Norteno) in jail in 2007. In 2007, he was in the stolen car with Broderick Boys Timothy Acuna. Police found multiple guns and ammunition in his residence within the safety zone, and he was convicted of felon in possession of ammunition. Norteno gangs keep caches of weapons in their territory for use in committing crimes.

### 3. *Jesse Garcia*

Jesse Garcia acknowledged gang membership in discovery responses. Plaintiff called him as a witness at trial. Before invoking the Fifth Amendment, he claimed he knows nothing about Broderick Boys and claimed he acknowledged membership because

that was how California Youth Authority (CYA) classified him when he was sent there in 2003 and 2005. On the facility intake form, he circled "Norteno" and wrote in Broderick Boys because he was told to do so.

### 4. *Robert Montoya*

Montoya had numerous gang-related tattoos in 2006 and 2007. In speaking with police in 2005, he "self-admitted" being a Broderick Boy. He identified as a Northerner in a jail questionnaire in 2006. His parole agent testified that in 2008 Montoya said he was "a" current leader of Broderick Boys, but the agent did not independently validate that assertion. Five months before the 2010 trial, as the agent placed handcuffs on Montoya (for possessing alcohol and possessing gang-related clothing -- a "Rider" shirt, Riders being a word used for drop-outs who are sort of their own gang), Montoya said he was a Broderick Boys leader and offered to "give up" other gang members to make a deal.

### 5. *Michael Morales*

In May 2005, police stopped a speeding car driven by Michael Morales with gang member Guillermo Rosales as passenger. Their presence together violated the 2004 injunction. Michael Morales pleaded no contest to carrying a concealed firearm in a vehicle and got probation, and Rosales pleaded no contest to misdemeanor possession of marijuana. In January 2007, police arrested Morales in a car with Rosales, and Morales pleaded no contest to conspiracy to transport or sell methamphetamine. In jail questionnaires in 2006 and 2007, Morales admitted being a Broderick Boy.

### 6. *Guillermo Rosales*

Rosales got probation for marijuana possession in the 2005 incident where he was with Michael Morales. Rosales sold drugs to an informant in December 2006 and pleaded no contest to possession of methamphetamines for sale. On an unspecified date,

police apprehended Rosales in possession of a firearm in a car with three other Norteno gang members. The gang expert opined the group was "patrolling," i.e., gang members driving around looking for a confrontation. Rosales admitted being a Northerner in jail questionnaires. At trial, Winger opined Rosales is not "presently" contributing to the nuisance because he is in prison.

### 7. *Felipe Valadez, Jr.*

He was one of the people involved in a fight in July 2006. Police responding to a report of a fight on July 16, 2006, saw a group of people, one with a baseball bat and one with a tire iron. Some fled, but police arrested Valadez and Rainey Martinez for violating the gang injunction. Police detained others, including Christopher Castillo and Jesse Garcia, but released them due to the victim's unwillingness to cooperate. A police officer testified that in February 2007, he saw Valadez writing "BRK" on a wall in the safety zone. In July 2009, police arrested Valadez for public intoxication and possession of methamphetamines. He yelled, "Fuck West Sac[ramento] PD. I'm Broderick. Straight BRK. I don't give a fuck." Felipe Valadez has Broderick tattooed on his stomach, and a "1" and "4" on his arms. In March 2007, he pleaded no contest to misdemeanor criminal street gang activity.

### 8. *Billy Wolfington*

In August 2001, Wolfington pleaded no contest to possession of a controlled substance for sale. When arrested, he was in the presence of Broderick Boys member Raymond Corona. In May 2002, Wolfington pleaded no contest to a March 2002 incident of possessing a controlled substance while armed with a loaded gun. Wolfington admitted being a Northerner in December 2006. When returned to jail on a parole violation, Wolfington described himself as a "northern dropout" in a jail questionnaire, but Villanueva opined this was a lie to gain more freedom while in custody. At the time

of trial, Wolfington was not contributing to a public nuisance due to the fact he was in custody.

Appellants fail to show reversible error regarding active membership.

VI

*Challenges to Specific Provisions of Injunction*

Appellants contend specific provisions of the injunction (1) lack substantial evidence of a need for them, and (2) violate constitutional rights without any showing of necessity. Under this heading, appellants argue in a first subheading that the evidence does not support particular provisions (non-association, curfew, no-trespassing, anti-graffiti, and the safety zone boundaries), and that the entire injunction violates the due process prohibition on guilt by association.

Under multiple separate subheadings, appellants argue they have standing to challenge the injunction as overbroad; the injunction violates their First Amendment and due process rights; the definition of active gang member is vague and overbroad and violates First Amendment and due process liberty interests; the anti-association and curfew provisions are vague and overbroad and violate First Amendment and "intimate" liberty interests under the due process clause; and other provisions of the injunction are vague and overbroad. We already addressed some of these contentions in our 2010 opinion.

A. *Standing*

Appellants claim they have standing to challenge the injunction as overbroad as to third parties, without showing violation of appellants' own constitutional First Amendment rights and liberty interests. Appellants are wrong. They cite case law challenging overbreadth of *statutes*, not *injunctions*. (E.g., *Broadrick v. Oklahoma* (1973) 413 U.S. 601, 612 [37 L.Ed.2d 830].) The California Supreme Court expressly discussed the distinction in *Gallo v. Acuna, supra*, 14 Cal.4th at pages 1112-1115. The

66

"narrow and particularized focus inherent in the nature of the injunction" does not embody "the broad and abstract commands of a statute." (*Id.* at p. 1114.) "Unlike the pervasive 'chill' of an abstract statutory command that may broadly affect the conduct of an absent class and induce self-censorship, the decree here did not issue until after *these* defendants had had their day in court, a procedure that assures ' "a prompt and carefully circumscribed determination of the issue." ' [Citation.]" (*Ibid.*; orig. italics.)

Appellants dismiss *Gallo v. Acuna* on the ground that there the "only individuals subject to the trial court's interlocutory decree . . . are *named parties* to this action, [whose] activities allegedly protected by the First Amendment have been and are being aggressively litigated. There is accordingly no basis, legal or factual, for the professed concern that protected speech or communicative conduct by anyone *other* than defendants might be endangered by the terms of the trial court's injunction." (*Id.* at p. 1114; orig. italics.) Here, the injunction applies to "active members" not named in the complaint.

However, as we said in *Broderick Boys, supra*, 149 Cal.App.4th at page 1516, "a nonparty [who is served with the injunction] *could* attack the injunction in a declaratory relief action [citation] or in defense of contempt charges [Citation]." (Orig. italics.)

We conclude appellants lack standing to assert overbreadth challenges on behalf of nonparties to the appeal.

B. *The "Do Not Associate" Provision*

The permanent injunction "enjoin[s]" and restrain[s] appellants from "engaging in or performing, directly or indirectly, any of the following activities in the Safety Zone: [¶] a. **Do Not Associate**: Standing, sitting, walking, driving, gathering or appearing, anywhere in public view or any place accessible to the public, with any known member of the Broderick Boys, including but not limited to those members identified by name in this order. This non-association order shall not apply when the enjoined parties are inside

67

a school attending class or on school business, or inside a church; however, the non-association order shall apply to the enjoined parties when they are traveling to or from school or church."

In the prior appeal from the preliminary injunction, appellants argued that an identical provision infringed on their constitutional right of association, by prohibiting them from gathering in public places for lawful and peaceful purposes, and by interfering with intimate family relationships. (*Acuna I, supra*, 182 Cal.App.4th at pp. 885-886.) We held the preliminary injunction did not burden association rights more than was necessary to serve the significant governmental interests at stake. (*Ibid*.) Appellants raise the same arguments again, but we need not address them again; *Acuna I* is law of the case.

In this appeal, appellants present a new argument, claiming insufficiency of evidence of ongoing public collective activity to support the non-association restriction, because there were only a few incidents involving multiple actors in 2010 and only seven in 2009. As indicated, however, a permanent injunction is appropriate if the misconduct is ongoing or likely to recur, and compliance with a preliminary injunction does not constitute voluntary discontinuation of the wrongful conduct rendering a permanent injunction unnecessary. (*Feminist, supra*, 32 Cal.App.4th at pp. 1658-1659.) Appellants fail to confront these legal principles and fail to show insufficiency of evidence that the nuisance activity was ongoing or likely to recur.

Appellants also contend the anti-association provision is vague and overbroad because it prohibits association with "known" members of Broderick Boys, yet fails to define "known." They cite no authority other than *Lanzetta v. New Jersey* (1939) 306 U.S. 451, 458 [83 L.Ed. 888], as indicating that "known" was ambiguous with reference to undefined "reputed" membership. However, *Lanzetta* was construing a statute, not an injunction. As indicated, statutes and injunctions are not equivalent for constitutional analysis. (*Gallo v. Acuna, supra*, 14 Cal.4th at p. 1114.) Moreover, *Lanzetta* is

68

inapposite. There, a New Jersey criminal statute stated that any unemployed person "known" to be a gang member, who has been convicted of a crime, is a gangster subject to a fine or imprisonment for that status. (*Lanzetta, supra*, 306 U.S. at p. 452.) After finding uncertainty in other parts of the statute, the *Lanzetta* court went on to say that the phrase "known to be a member" was ambiguous, because (1) if it meant actual membership, the word "known" would be without significance, but (2) if reputed membership sufficed, it was unclear whether that reputation must be general or extend only to some persons. (*Id*. at p. 458.) "Known" in the New Jersey statute referred to knowledge of unknown persons. Here, no equivalent ambiguity appears, because the injunction in context prohibits appellants from associating with people *whom appellants know* are gang members. Thus, the injunction in *Gallo v. Acuna, supra*, 14 Cal.4th at page 1110, enjoined the defendants from associating with "known" gang members, which the Supreme Court said effectively forbade gang members from engaging in any form of social intercourse with anyone "known to them" to be a gang member. (*Id*. at p. 1121.)

C. *The Curfew Provision*

The injunction enjoins and restrains appellants from "Remaining on public property, a public place, on the premises of any establishment open to the public, or on a vacant lot, between the hours of 10:00 p.m. on any day and 6:00 a.m. the following day, unless (1) going to or from a meeting or scheduled entertainment activity at a theatre, school, church or other religious institution, or sponsored by a religious institution, local educational authority, governmental agency or support group such as Alcoholics Anonymous, (2) actively engaging in a business, trade, profession or employment that requires such presence, (3) in an emergency situation that requires immediate attention; or (4) in the side yard or back yard of his or her own residence. A 'public place' is defined as any place to which the public has access, including but not limited to

69

sidewalks, alleys, streets, highways, parks, hospitals, office buildings, transport facilities and the common areas of schools."

In the prior appeal from the preliminary injunction, appellants challenged a similar curfew provision on the grounds that it infringed on constitutional freedom of movement and was vague and overbroad. (*Acuna I, supra*, 182 Cal.App.4th at p. 889.) We held the curfew provision did not sweep too broadly, nor did it invade protected freedoms of the defendants and other active gang members. (*Id*. at p. 891.)

In this appeal, appellants challenge the trial evidence as insufficient to establish an ongoing need for the curfew provision. Again, appellants' arguments incorrectly assume they benefit from the deterrent effect of the preliminary injunction.

D. *The "No Trespassing" Provision*

The injunction enjoins and restrains appellants from "Being present on or in any property not open to the general public, except (1) with the prior written consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) in the presence of and with the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property."

In the prior appeal, we rejected a constitutional challenge to an identical provision in the preliminary injunction. (*Acuna I, supra*, 182 Cal.App.4th at pp. 888-889.) We noted the gang expert's declaration that Broderick Boys use abandoned property as a "crash pad" to drink and do drugs, take over parking lots and common areas of apartment buildings, and use private residences to escape police pursuit. (*Ibid*.)

In this appeal, appellants argue "the evidence at trial did not establish that trespassing occurred. In fact, . . . only one incident involved trespassing in the entire record. That lone and remote incident occurred on July 25, 2006 . . . . Robert Sanchez and Rainey Martinez were both arrested for violation of Penal Code 211 [robbery], after they forced entry into a home and stole items therein. (RT 367:9-394:15.) There is no

70

justification, and no evidence was presented at trial, to support the imposition of a 'no trespassing' provision requiring written consent from an owner in order to visit a residence."  (Orig. brackets.)

Appellants' argument on this point misstates the record and fails to acknowledge other evidence favorable to the judgment.  For example, a trespass occurred in March 2007, when a shooting occurred after a homeowner asked three Broderick Boys gang members, who were being loud and drinking in his driveway, to leave.  In the Summer of 2009, Broderick Boys gang members threw objects into the driveway of a victim's home, calling the occupants "scraps" and challenging them to come out and fight.  Since appellants fail to acknowledge evidence favorable to the judgment, they forfeit their substantial evidence claim on this point.  (*Foreman, supra*, 3 Cal.3d at p. 881.)

Under a different subheading, appellants complain the "no trespassing" provision prevents them from stopping by the home of a relative who is out or attending to an emergency and requires even a renter to be present with a written lease in hand.  However, appellants misread the provision and offer no legal analysis rendering it defective.

### E.  *Graffiti*

The injunction enjoins:  "**No Graffiti or Graffiti Tools:**  Damaging, defacing, or marking any public or private property, or possessing any spray paint can, felt tip marker, or other graffiti tool as defined in Penal Code section 594.2."  Appellants argue "The evidence of graffiti in 2009 and 2010 is slight."  Another forfeiture by appellants, who fail to show that the multitude of graffiti observed by the court and counsel in their tour of the safety zone during trial in November 2010 were relics of an earlier time.  Moreover, since no one should be damaging or defacing property, the restriction cannot possibly prejudice appellants.

71

Appellants claim the provision prevents them from possessing markers for lawful purposes at their own home. No, it does not. The injunction references Penal Code section 594.2, which prohibits possession "with the intent to commit vandalism or graffiti."

Appellants complain the provision prevents them from marking private property with the owner's consent, even with non-gang markings. We disagree. The clause's heading ("graffiti") and reference to the Penal Code make clear that what is being restricted is graffiti, which the Penal Code defines as "any unauthorized inscription, word, figure, mark, or design . . . ." (Pen. Code, § 594, subd. (e).)

Appellants complain the provision applies to all active members, even those who have not done any graffiti. Appellants have no standing to challenge any provision as to any gang member other than themselves. Appellants need not have personally drawn any graffiti in order to be bound by the provision. "[I]n order to enforce a gang injunction against an alleged member, it must be shown the person 'participates in or acts in concert with [a gang] . . . whose members individually or collectively engage in the acts constituting the enjoined public nuisance.' " (*Acuna I, supra*, 182 Cal.App.4th at pp. 874-875.)

F. *Safety Zone Boundaries*

Appellants argue the boundaries of the safety zone are overbroad because there has not been much "ongoing" gang activity recently. We have already explained that the "ongoing" argument lacks merit.

G. *Remaining Provisions*

Under a subheading that the remaining provisions of the injunction are also vague and overbroad, appellants complain of the "no intimidation" clause restraining them from "Confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting or battering any person known to be a witness to any activity of the Broderick

72

Boys, known to be a victim of any activity of the Broderick Boys, or known to be a person who has complained about any activity of the Broderick Boys." Appellants argue the terms "confronting," "annoying," "challenging," and "provoking" are vague. These exact words were upheld against a claim of vagueness in *Gallo v. Acuna, supra*, 14 Cal.4th at page 1118, which said the words were not unconstitutionally vague when considered in context with the facts and the objectives of the injunction. Appellants suggest the Supreme Court's conclusion was dependent on the severity of the nuisance activity in that case, which appellants view as more severe than their own activity, but they cite nothing in *Gallo v. Acuna* supporting that suggestion. We reject appellants' meritless claim that the words are vague in this case "because there is no background that gives them contextual meaning." Appellants also complain the "no intimidation" clause does not say whether the "activity" must have been unlawful or by "active" members or whether complaints must be made to a government agency, and the clause applies to all active members even if they have never been suspected of intimidation. Appellants fail to show that any of these points render the provision unconstitutional.

Appellants complain about the "no guns" clause, which restrains them from "Anywhere in public view or any place accessible to the public, (1) possessing any gun, ammunition, or illegal weapon as defined in Penal Code section 12020, (2) knowingly remaining in the presence of anyone who is in possession of such gun, ammunition, or dangerous weapon, or (3) knowingly remaining in the presence of such gun, ammunition or dangerous weapon." Appellants complain this clause applies even to those appellants who have never had or used a gun illegally, and even when the gun is licensed or "otherwise protected by law." Appellants offer no analysis converting this gripe into a meritorious constitutional claim.

Appellants assert that restrictions to "stay away from drugs" or "obey all laws" simply reiterate the criminal law, rendering such provisions unnecessary.

73

VII

*Miscellany*

Appellants' brief, under a heading that the trial was fundamentally unfair, raise other contentions, some of which we have already addressed. The remaining points have no merit.

1. Appellants complain the trial court improperly refused to order incarcerated defendants to be transported to court to testify, which supposedly prevented the defense from rebutting plaintiff's evidence and presenting affirmative defenses. They cite authority that an indigent prisoner who is a defendant in a civil action threatening his personal interests has a federal and state constitutional right, as a matter of due process and equal protection, to meaningful access to the courts in order to present a defense. (*Payne v. Superior Court* (1976) 17 Cal.3d 908, 913-919.)

The appellate brief does not name names to show that any *appellant* was denied the right to appear in court. Appellants again violate appellate rules by simply incorporating by reference papers filed in the trial court. (*Garrick, supra*, 3 Cal.App.4th at p. 334.) Again, we overlook the violation.

Meaningful access does not necessarily mean personal appearance, nor does it mandate a particular remedy. (*Payne v. Superior Court, supra,* 17 Cal.3d at p. 923.) The trial court has discretion which remedy to choose, including appointment of counsel for the prisoner (when there is a bona fide threat to his personal or property interests and no other feasible alternative exists), transfer of the prisoner to court, using depositions in lieu of personal appearance, etc. (*Id.* at p. 925; *Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 792-794.) We will not overturn the trial court's exercise of discretion absent a miscarriage of justice. (*Wantuch,* at p. 794.)

In denying appellants' motion for production of (appellants) Michael Morales and Guillermo Rosales and petition for writ of habeas corpus to transport the prisoners to

74

court, the trial court noted they were being represented by counsel in this trial, the defense could have proceeded by depositions, Rosales had already invoked the Fifth Amendment in written discovery, and the defense failed to persuade the court to exercise discretion to order the prisoners produced in this civil case. Appellants mention none of this in their brief but just argue that no one could testify as powerfully and persuasively as the prisoners, as to what they mean by their identification as Broderick Boys, and their clothing and tattoos.

Appellants fail to show grounds for reversal.

2. Appellants next claim the trial court displayed favoritism for plaintiff because the court originally scheduled the trial to proceed every other week but at the conclusion of plaintiff's case ordered the defense to put on its case without benefit of "rest weeks." Appellants forfeit the point by failing to address the court's fundamental power to control litigation (Code Civ. Proc., § 128) and failing to cite any evidence whatsoever of favoritism rather than reasonable case management of protracted litigation that ultimately spanned five months.

3. Appellants argue the trial court denied them procedural due process by failing to appoint counsel when defendants' physical liberty was at stake (due to the curfew and "do not associate" provisions of the injunction). We need not consider the point, because appellants were all represented by counsel, and they fail to show they have standing to raise this contention on behalf of others. Moreover, *Iraheta v. Superior Court* (1999) 70 Cal.App.4th 1500, 1511-1515, held due process did not give alleged street gang members a right to appointed counsel in an action for a gang injunction.

4. Appellants argue the trial court erroneously denied a motion to recuse the entire Yolo County judicial branch from hearing the case. The defense theory was that Broderick Boys' criminal convictions in Yolo County must have poisoned all judges against them. However, as appellants acknowledge, the motion was denied because it was untimely and lacked a written verified statement as required by Code of Civil

75

Procedure sections 170.3 and 170.4.  Appellants offer no legal analysis to overcome the defects; hence we need not consider the contention.

5.  Appellants contend the trial court erred in denying a defense motion to move the trial from the Yolo County courthouse to a courtroom in the City of West Sacramento -- the community most directly affected by the nuisance activities.  They assume this is required by the Sixth Amendment to the United States Constitution, which says *criminal* prosecutions are to be held in the state and district where the crime was committed.  This is not a criminal prosecution.  Appellants champion the benefit of easy access for affected citizens to attend trial, but they offer no evidence or legal analysis applicable here.  Appellants argue the trial court deprived them of a public trial by barring testifying witnesses from the courtroom until after they testified.  They offer no supporting authority.

We conclude appellants fail to show grounds for reversal.

DISPOSITION

The judgment is affirmed.  Plaintiff shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278.)

       HULL       , J.

We concur:

     RAYE      , P. J.

     BUTZ      , J.